| | |
|---|---|
| 7 | 385 |
| 47 | 512 |
| 47 | 522 |

# MENARD and VIGNEAUD *v.* J. B. SCUDDER, and NOLAN STEWART, Executor of MCCALOP.

| | |
|---|---|
| 7 | 385 |
| 122 | 673 |
| 122 | 676 |

A safe rule of construction of a guaranty is, to give the instrument that effect, which shall best accord with the intentions of the parties, as manifested by the terms of the guaranty, taken in connection with the subject matter to which it relates;—neither enlarging the words beyond their natural import in favor of the creditor, nor restricting them in aid of the surety.

MENARD
*v.*
SCUDDER.

From the nature and purposes of mercantile guarantees, and the circumstances under which they are usually prepared, it seems improper to subject them to the standard of critical nicety.

A letter in the following words—"I do recommend my friend, *Mr. J. B. Scudder,* of the parish of East Baton Rouge, a planter, and any funds that he may raise, or acceptances, in case he does not pay, I feel bound to pay. *James McCalop*"—contemplates a continuing guaranty.

In the case of a prospective and continuing guaranty, the creditor must not only show, that he advanced his money, or parted with his goods, on the faith of the letter of guaranty, but that he also seasonably notified the guarantor, that he accepted the guaranty, and intended to act upon its security. But express and formal notice, emanating directly from the creditor to the guarantor, is not indispensable. If the fact of acceptance is seasonably brought to the knowledge of the signer in any other way, and he acquiesces by silence, it is sufficient.

The death of the guarantor, without notice or knowledge of the fact on the part of the creditor, does not defeat the creditor's right to indemnity for advances made in good faith, after the event.

APPEAL from the District Court of the parish of East Baton Rouge. This cause was tried by a jury, before *Burk,* J. *G. S. Lacey* and *T. G.* and *P. H. Morgan,* for the plaintiffs. *R. H. Marr, Cyrus Ratliff,* and *J. M. Elam,* for defendants. By the court:

SLIDELL, J. In this action, the plaintiffs seek to recover from *Scudder,* and also from the succession of *McCalop,* by reason of a letter of guaranty signed by him, a sum of $19,864 03¾, being a balance, exhibited by an account annexed to the petition, arising from supplies furnished for the use of *Scudder's* plantation ; monies advanced and expended for him at his request, upon accommodation acceptances, accommodation endorsements, orders, &c.

There was a verdict for the plaintiffs, against *McCalop's* estate, for the sum of $15,738 03, and the executor has appealed.

The letter of guaranty, upon which the claim is made, is in these words : "Baton Rouge, December 4, 1849. I do recommend my friend, *Mr. J. B. Scudder,* of the parish of East Baton Rouge, a planter, and any funds that he may raise, or acceptances, in case he does not pay, I feel bound to pay. *James McCalop.*"

There is no doubt, this instrument contains a proposed contract of guaranty. It is not a mere recommendation. With the recommendation, is cumulated the declaration : "any funds that he may raise, or acceptances, in case he does not pay, I feel bound to pay." The common sense of this declaration, is a promise to indemnify ; a guaranty to those who might lend him money, or accept for him. The proposition that this instrument was a mere expression of a feeling of moral duty, and did not contemplate a legal obligation, is not worthy of serious consideration. As the letter was intended to hold out inducements to others, to part with their money, and was calculated to create a just appreciation of indemnity, good faith requires, that such expectations should be fulfilled ; and a breach of good faith, in such case, to another's detriment, the law will not tolerate.

But a graver question is presented, when we inquire what is the extent of the legal responsibility contemplated by the writer. Was it intended as a limited, or as a continuing guaranty ? Was it a guaranty, intended to attach only to such aid, by way of loan or acceptance, as should be given to *Scudder,* on the presentation of the letter, or was it intended to cover such transactions with him from time to time, as the necessities of the one, and the convenience of the other, might dictate ?

The solution of this question is not free from difficulty, and might, perhaps, be solved in either way, according as one might choose to adopt, in the extreme of the conflicting doctrines which are to be found in the adjudged cases. Some of the authorities advocate, in favor of the surety, a strict rule of construction, and seem to demand, that it should appear unequivocally, that it was the purpose of the guarantor, to guarantee the payment of debts contracted from time to time. See *Melville* v. *Hayden*, 3 Bar. and Ald., 593. Opinion of Best, J. *Cremer* v. *Higginson*, 1 Mason, 336. *Whitney* v. *Groot*, 24 Wendell, 84.

On the other hand, there are authorities which countenance the doctrine, that a large and liberal construction is to be given, in such cases, in favor of one claiming rights under such guaranty, and holding it to be the duty of the guarantor, to limit his guaranty expressly to a single dealing, if he would avoid a further responsibility. See *Mason* v. *Pritchard*, 12 East. 227. *Hargrave* v. *Smee*, 6 Brigham, 244. *Durmond* v. *Presman*, 12 Wheaton, 518. *Lawrence* v. *McCalmont*, 2 Howard, 450. *Lee* v. *Dick*, 10 Peters, 493. Opinion of Lord Ellenborough, cited in Smith's Mercantile Law, 386.

The true doctrine, we are inclined to believe, lies between these extreme opinions; and we think it was very judiciously observed by *Dewey*, J., in *Massey* v. *Raynor*, 22 Pick. 228, that a safe rule of construction would be, to give the instrument that effect, which shall best accord with the intentions of the parties, as manifested by the terms of the guaranty, taken in connection with the subject matter to which it relates, and neither enlarging the words beyond their natural import, in favor of the creditor, nor restricting them in aid of the surety. See also *Bell* v. *Bruen*, 1 Howard, 187.

In furtherance of this rule of construction, we would add, that for the nature and purposes of mercantile guaranties, and the circumstances under which they are usually prepared, it seems improper to subject them to the standard of critical nicety, which might, with more reason, be applied to instruments usually drawn by professional men. Mercantile guaranties are usually written by the guarantor himself, and are often brief in their language, and inartificial and loose in their form. And in such cases, a nice and technical construction, might rather confuse, than aid the mind, in its search for the true intentions of the writer. We should endeavor, if possible, to put ourselves in the condition of the parties, and so seek to ascertain, from the words used, what were the ideas which existed in the writer's mind, and which he desired to convey to the person, or class of persons, to whom the letter would probably be exhibited; and we should also consider, what effect he ought reasonably to expect the words used, would produce in the minds of such persons. See also Civil Code, arts. 1948, 1897.

Now, *McCalop* was a planter. His friend, *Scudder*, whom he recommends, was a planter. He so describes him in the letter. He may be reasonably supposed as having, in his mind, the usual course of business, and the usual wants of a planter; the usual mode in which persons, in that avocation, seek for pecuniary facilities, and in which merchants extend them. He desires to facilitate *Scudder* in getting commercial aid, and he gives him the letter for that purpose. The words are adapted to the purpose: I recommend him. His business is that of a planter. As such, he wants to raise money. He wants some one to aid him, by cash advances, or accommodation acceptances. If any one will assist him in this way, I will pay them if he does not. He does not say, I will guarantee a single loan, or a single acceptance; but he speaks in the plural: any funds he may raise, or acceptances.

Considering the business of the person, whom he proposed to benefit, the nature of the business to be transacted, and the class of the community to whom it was reasonable to suppose the letter would be exhibited, we are led to the conclusion, that a continuing guaranty was contemplated by *McCalop*, and that it would be so understood by a Louisiana merchant.

We have looked, with much care, into the decided cases, and find the prevailing doctrine to be, that, in the case of a prospective and continuing guaranty, the creditor must not only show that he advanced his money, or parted with his goods, on the faith of the letter of guaranty, but that he also seasonably notified the guarantor that he accepted his guaranty, and intended to act upon its security. As the subject is one of much commercial importance, it is proper to refer to some of the principal cases which bear upon it.

In *Russell* v. *Clark's Executors*, 7 Cranch, 69, it appeared that *Clark* and *Nightingale*, of Providence, had written to *Russell* letters, introducing and recommending their friends, *Murray & Co.*, of New York, who had in contemplation purchases of merchandise in Charleston. Judge Marshall, in giving the opinion of the court, considered the letters as recommendatory merely, and not constituting a contract, by which *Clark* and *Nightingale* undertook to render themselves liable for the engagements of *Murray & Co.* to *Russell*; but, he observes, had it been such a contract, it would certainly have been the duty of the plaintiff, to have given immediate notice of the extent of his engagements.

In *Cremer* v. *Higginson*, 1 Mason, 340, which was the case of a letter of credit, specially addressed, Story, Justice, held that it was clearly the duty of the plaintiff to notify the defendants that reliance was placed on the guaranty.

In *Edmonston* v. *Drake* and *Mitchel*, which was the case of a letter of credit, specially addressed, Chief Justice Marshall observed: It would, indeed, be an extraordinary departure from that exactness and precision, which peculiarly distinguish commercial transactions, which is an important principle in the law and usage of merchants, if a merchant should act on a letter of this character, and hold the writer responsible, without giving notice to him that he had acted on it.

In the case of *Douglass* v. *Reynolds*, 7 Peters, 117, *Douglass*, and others, had addressed a letter to *Reynolds, Byrne & Co.*, in which they said, their friend, *Hwring*, to assist him in business, might require *R., B. & Co.'s* aid, from time to time, either by acceptance or endorsement of his paper, or advances in cash. And they bound themselves to be responsible to *R., B. & Co.*, at any time, for a sum not exceeding $8000. The court considered this a continuing guaranty, and held, that it was necessary, to entitle *R., B. & Co.* to recover on the letter, that they should prove, that notice had been given, in a reasonable time after the letter had been accepted by them, to the guarantors, that it had been accepted.

In *Lee* v. *Dick*, 10 Peters, 492, the question of necessity of notice of acceptance of the guaranty, arose under a letter addressed in Tennessee, by *Lee*, to *N. & J. Dick & Co.*, of New Orleans, in which they said, *Nightingale* and *Dexter* wish to draw on you at six or eight month's date. You will please accept their draft for $2000, and I do hereby guarantee the punctual payment of it. The court observed, the question is, whether the plaintiffs were bound to give notice to the defendant, that they intended to accept, or had accepted and acted upon this guaranty. It is to be observed, that this guaranty was prospective; it looked to a draft thereafter to be drawn; and this question is put

at rest by the decision of this court. They cited *Russell* v. *Clark's Executors*, 7 Cranch, 91; and *Edmonston* v. *Drake* and *Mitchell*, 5 Peters, 624.

So, in *Adams* v. *Jones*, 12 Peters, 213, it was held, that upon a letter of guaranty, addressed to a particular person, or persons generally, for a future credit to be given to the party in whose behalf the guaranty is drawn, notice is necessary to be given to the guarantor, that the person crediting has accepted or acted upon the faith of the guaranty.

See also *Wilds* v. *Savage*, 1 Story, 32. *Backman* v. *Hale*, 17 Johnson, 140. *Bank of Illinois* v. *Sloo* and *Byrne*, 16 L. R. 542. *Cremer* v. *Higginson*, 1 Mason, 340. *Massey* v. *Raynor*, 22 Pickering, 228. *Norton* v. *Eastman*, 4 Greenleaf, 521.

In citing the foregoing authorities, we do not wish to be understood as adopting them in their entire scope. Some of the rules which they enunciate have been, in subsequent decisions, qualified or abandoned; but so far as they inculcate the necessity of notice of acceptance, in a case like the present, to which case we desire to confine our opinion, we believe they have commanded a frequent concurrence in American courts, and we do not doubt their correctness. For, where the letter of guaranty is addressed to the public at large, where it is prospective, and to attach upon future transactions, where it is unlimited in amount and indefinite in duration, and is by its nature subject to recall, it seems manifestly just that the guarantor should be entitled to notice of acceptance, within a reasonable time, from the person who undertakes to act upon its faith. Such notice is material and important for many reasons. It enables the guarantor to know in whose favor the guaranty has attached or is about to attach; to form an idea of the probable nature and extent of his liability; to appreciate the necessity of vigilance on his own part; to avail himself, when necessary, of the appropriate means in law and equity, to protect himself with regard to liabilities which may have accrued, and to arrest their future creation by a recall.

We have not overlooked the fact, that the late decisions in New York (see 24 Wendell, 35, 3 Comstock,) conflict with this opinion, but we think the weight of authority and argument presented by the cases cited, preponderates in its favor.

We come now to the inquiries, whether *McCalop* had reasonable notice of acceptance of the guaranty by the plaintiffs. And, upon this point, we premise that express and formal notice, emanating directly from the creditor to the guarantor, is not indispensable. If the fact of acceptance is seasonably brought to the knowledge of the signer, in any other way, and he acquiesces, by silence, it appears to us sufficient. C. C. 1805, 1812, &c. *Train* v. *Jones*, 11 Vermont, 444.

There is no express evidence of notice in the present case. It rests upon circumstantial evidence alone, and this branch of the cause is certainly not free from difficulty. It presents another instance of that looseness with which commercial business is conducted in this State; a looseness which is the fruitful parent of litigation, and a source of extreme embarrassment to our tribunals, who are often called upon to apply the principles of commercial law to transactions in which the actors have disregarded that method, exactness and forecast, which ought to distinguish commercial dealings.

It is contended by the plaintiffs, that notice may be inferred from the following circumstances, exhibited by the evidence, and which are thus stated and commented upon in the argument of their counsel:

"I. From the fact that *Menard* and *Vignaud* had previously been the merchants of *Scudder*, *McCalop* could well presume, from that circumstance, that *Scudder* had given the letter to his old factors.

"II. From the circumstance that *M.* and *V.* were the accommodation acceptors and endorsers of the joint paper of *McCalop* and *Scudder*, given for the benefit of the latter.

"III. From the connection and intimacy which existed between *Scudder* and *McCalop*. The testimony proves that *Scudder* had married a relative of *McCalop*; that the latter had gratuitously raised a heavy mortgage, which he held upon the property of the former, and that *McCalop* had placed in the possession of *Scudder* an unlimited letter of credit; and, with these facts standing prominently forth, can we for a moment presume that *Scudder* did not frankly and promptly inform his friend and benefactor, in whose hands he placed the letter of credit? At least, is not this a question of fact, properly submitted to the jury? And the jurors having, by their verdict, found in our favor upon that question, can this court feel authorized to reverse the finding upon that point."

The facts thus generally stated, are certainly quite cogent, and they do not loose their force by a more minute and detailed examination. For example, it appears that on the 8th January, 1850. a few weeks posterior to the date of the letters of guaranty, *Scudder* drew, at Baton Rouge, two drafts to the order of and endorsed by *McCalop*, who was an accommodation endorser, at eleven and twelve months, for $2000 and $2500, upon *Menard* and *Vignaud*, which were accepted by them a day or two afterwards, for the accommodation of *Scudder*, and being thus accepted were put, by the acceptors, into the market in New Orleans and discounted. The proceeds of discount were put to the credit of *Scudder*, in account current, on the 11th January, 1850, and they were paid at maturity, to the holder, by the acceptor. Tested by technical rules, applied to the face of the instrument, and without the assistance of surrounding facts, this bill transaction would not aid the plaintiffs; but, considered with reference to the true relations of the parties to the bills, and the irregular but well known course of dealing between our factors and planters, by which the factor raises money for the planter, through his own accommodation acceptances of the planter's bills, these transactions become very significant, and can hardly be reconciled with any other hypothesis than that *McCalop* knew the purpose of the drafts, and that his guarantee had been or would be presently used to obtain for his friend the desired accommodation. Again, on the 8th February we find *Menard* and *Vignaud* endorsing and getting discounted in the New Orleans market, for the accommodation of *Scudder*, his note dated Baton Rouge, January 27, 1850, at twelve months, for $4500, endorsed by *McCalop*, which was taken up, after protest, by the plaintiffs. On the 18th April, 1850, the plaintiffs again accepted a draft of *Scudder*, endorsed by *McCalop*, for $5000, at four months. Other circumstances of like character are shown by the record, but it is unnecessary to state them in detail.

Now, the letter on its face indicates that *Scudder* was in need of accommodation. It was a letter given to be used for that purpose, and as the subsequent acts of *McCalop* connect him so palpably with the efforts of *Scudder* to obtain accommodation from the plaintiffs, and the defendants have not shown any facts which could have tended to create an idea in *McCalop's* mind, that the letter of the 4th December had been used elsewhere, we are naturally led to the conclusion that he was well acquainted with the direction it had taken. The same circumstances, and the great intimacy between *McCalop* and *Scud-*

*der* may account for the omission, on the part of the plaintiffs, to address him a formal letter of acceptance.

It is said the precise time when the letter came into the possession of the plaintiffs does not appear. It is undisputed that it was in their possession in the early part of April, 1850, after which period important advances were made; and the circumstances of the case point strongly to the inference that it was exhibited to them personally, after its date. That inference was drawn by the jury, and the defendant asks with a bad grace for a reversal of the verdict on that score, having opposed and succeeded in excluding (erroneously, we think,) testimony which would have given more precision to this matter.

Where a guaranty has been accepted, and the guarantor knows the facts, notice from time to time of the advances actually made, appears in general to be unnecessary. See *Wilds* v. *Savage*, 1 Story, 33.

It is said that although *McCalop* died on the 9th July, 1850, matters went on in the same way as before, until some months after his death, when the account terminates; and that advances after his death should be stricken from the account, so far as *McCalop's* estate is concerned. Upon inspection of the account we find there were some advances subsequent to 9th July on the one hand, and remittances on the other; and, perhaps, upon a different showing the subsequent remittances, there being no express appropriation at the time, might be applied, *quoad* the guarantor, to the antecedent indebtedness of *Scudder*, which would result in some reduction in the appellant's favor. But as the case stands, upon the evidence, we do not feel authorized to disturb the verdict.

A guaranty like the present, we understand, is countermandable by the guarantor so as to arrest his further liability after notice; and it may be that the death of the guarantor would operate a revocation after notice of the death, or knowledge of the fact brought home to the creditor. But so far as we may judge from the analogies of the law, the mere death, without notice or knowledge, ought not to defeat the creditor's indemnity for advances, made in good faith, after that event. See the article 3001 of the Civil Code as to acts done in good faith, by an agent, after the death of his principal. See also Troplong Du Contrat de Societé, No. 903. Utilitatis porro reipublicæ maxime circa commerciorum libertatem versatur. Nihil autem est quod exercendis commerciis et propagandis tantopere prosit, quantum si publice et bonâ fide contrahentes sciant se certo contrahere, Comm. de Favre (L. 24, § 1, D. de Minoribus.) Cited by Troplong, note No. 903, supra.

The judgment of the district court is affirmed, with costs.

An application was made for a re-hearing, when the court determined to reconsider the case on some of the points, and made the following memoradum:

SLIDELL, J. Upon the principal matters embraced in this cause, the opinion of the court, as hitherto pronounced, remains unchanged. But we have concluded to reconsider so much of the case as concerns the alleged indebtedness of *McCalop*, accruing after his death. This reconsideration is allowed in consequence of the impression entertained by a portion of the court, that knowledge, by the plaintiffs, of *McCalop's* death, immediately, or soon after that event occurred, may be inferred from the evidence.

In the reconsideration of this branch of the cause, it will be proper for counsel to discuss certain questions of law, which it was not necessary, positively, to decide in the absence of proof of notice or knowledge of the death.

The attention of counsel is therefore invited to the following points, not excluding any others that may be deemed pertinent to the case so far as opened.

MENARD<br>v.<br>SCUDDER.

I. Does the death of the writer of such a letter of guaranty operate an implied revocation as to future transactions?

II. If so, at what period does such revocation take effect? From the date of the death, or the date of notice to, or knowledge by the creditor?

III. Is the evidence in this cause sufficient to establish, with reasonable certainty, such notice or knowledge, and authorize a reversal of the verdict of the jury?

IV. If so, what application is to be made of subsequent remittances or payments?

V. Present statements of balance of account, according to the views of counsel, so as to enable this court to act definitively in the cause, if possible, and not remand.

## SAME CASE—ON A RE-HEARING.

By the court:

PRESTON, J. After very able and elaborate arguments in this case, we came to the conclusion, that the executor of *James McCalop* was liable to the plaintiffs, *on his letter of credit* in their possession, in favor of *John B. Scudder,* dated the 4th of December, 1849. We inferred a knowledge as to *McCalop* of its acceptance, from the testimony, the relations of the parties, their proximity of residence, and the intrinsic character of the plaintiffs' account against the defendants.

*McCalop* died on the 9th of July, 1850, but the account was continued until the 31st of January, 1851, and the balance to the last date is claimed. But the power of *Scudder* to raise, and of the plaintiffs to furnish funds, on the credit of *McCalop,* ceased as soon as his death was known to them.

From their relations, residence, the distinction of the deceased as a planter and landholder, his note as a citizen, and the evidence generally, we infer, that his death was known to the plaintiffs, immediately after it occurred.

The balance due at the death of *McCalop,* is all that the plaintiffs can claim from his executor; and all payments subsequent to that event, his executor has a right to impute on that balance, no imputation having been made by *Scudder.*

A cash balance existing against *Scudder,* when the letter of credit was given, cannot affect the result. It is extinguished; *Scudder* having acknowledged the plaintiffs' account, by which it was merged in account current.

The debit side of *Scudder's* account when *McCalop* died, amounted to $43,099 83. The whole payments made by *Scudder* before suit, amounted to $30,664 38. Leaving a balance due of $12,435 45. Interest and commission, rejected, $312 74. Leaving $12,122 71. And to bring this indebtedness within the very terms of the letter of credit, we have no doubt, that the plaintiffs hold the following notes and acceptances of *Scudder,* given while it was in existence and payable after the death of *James McCalop.* The draft of *Scudder* in favor of *McCalop,* dated the 8th of January, 1850, and payable the 11th of December, 1850, for $2000. The draft of *Scudder* in favor of *McCalop,* in like manner, accepted and paid by the plaintiffs, dated the 8th of January, 1850, and payable the 11th of January, 1851, for $2500. The note of *Scudder,* endorsed by *McCalop,* dated the 27th of January, 1850, and paid the 30th of January, 1851, for $4500. The joint note of *Scudder* and *McCalop,*

dated the 27th of May, 1850, and payable the 31st of January, 1851, for $5500=$14,500.

And, we suppose, these with some smaller drafts, were the foundation of the verdict of the jury; but, that they failed to credit payments made by Scudder after McCalop's death.

They allowed too much, but erred on the other side, by not allowing interest as prayed for in the petition.

The judgment of the district court is reversed, and judgment rendered in favor of the plaintiffs, against *Nolan Stewart*, executor of *James McCalop*, for the sum of twelve thousand one hundred and twenty-two dollars and seventy-four cents, with interest from the judicial demand, and costs in the district court. The costs of appeal to be paid by the plaintiffs, appellees.