### *In re* KELLEY'S ESTATE.

### BEDFORD *v.* KELLEY.

1. PRINCIPAL AND SURETY — RELEASE OF SURETY — NEGOTIABLE INSTRUMENTS—BILLS AND NOTES.

   By extending the time for payment the payee of a note releases the surety, guarantor, or indorser who has not consented to the extension.

2. SAME—DISTINCTIONS—GUARANTY.

   Surety and guarantor are similar in that each promises to answer for the debt or default of another, the surety assuming liability as a regular party to the primary undertaking, while the guarantor's liability arises out of an independent collateral agreement by which he undertakes to pay the obligation if the principal fails to respond.

3. SAME—CONTRACTS—CONSIDERATION.

To release either, an extension of time must be more than a mere agreement to indulge or forbear, and must have the essentials of a binding contract, must be reasonably definite as to time, must be for a valuable consideration, payment of interest in advance being a sufficient consideration.

4. SAME—EVIDENCE—PAROL RULE.

Though evidence to show the relations of the parties and attending circumstances is admissible as an aid in interpreting or construing a writing that is doubtful or ambiguous, it is not competent to contradict the plain provisions of an instrument.[1]

5. SAME—REVOCATION—DEATH.

Makers of a demand note, as collateral to loans or advances made by a bank in which they were interested, continued liable while extensions of time were given by the bank to the corporation, until revocation by act of the guarantors or other act of the parties: the death of one of the guarantors terminated the progressive nature of the indemnity agreement and extensions of time to the principal debtor thereafter released the estate of decedent from liability.

6. SAME—TERMINATION—REVOCABLE GUARANTIES.

Guaranties are of two classes; (1) the consideration being entire, passing wholly at one time, (2) the consideration passing at different times and being separable or divisible: the former are revocable by the guarantor and do not terminate at his death, upon notice of the fact; the latter may be revoked as to subsequent transactions by the guarantor, upon notice to that effect, and are terminated by his death and notice of that event.

7. SAME—LACHES—GUARANTY.

Delay for about four years after decedent's death in attempting to enforce collection of an indebtedness, guaranteed by a joint note of decedent and others, where the principal debtor was a corporation that was solvent over two years after such

---

[1] On the question of parol evidence as to whether guaranty was a continuing one, see note in 39 L. R. A. (N. S.) 740.

As to effect under negotiable instrument law of extension of time to principal to release surety or guarantor, see note in 31 L. R. A. (N. S.) 149.

On the question of the effect of death of party on guaranty, see note in 23 L. R. A. 709.

As to extension of time by attorney as discharging surety, see note in 39 L. R. A. (N. S.) 62.

death, when it became insolvent, no notice being given to decedent or his estate of default, was laches sufficient to release the liability of the estate of decedent and bar contribution to the joint indemnitors.

Error to Berrien; Coolidge, J. Submitted October 9, 1912. (Docket No. 15.) Decided January 3, 1913.

John W. Bedford and others presented a claim against the estate of Frank M. Kelley, deceased, for contribution. From a judgment of the commissioners on claims allowing the claim, defendant estate by Lafayette Kelley, administrator, appealed to the circuit court. Judgment for claimants and said administrator brings error. Reversed, new trial denied.

*Gore & Harvey*, for appellant.

*Humphrey S. Gray* and *Frank H. Ellsworth*, for appellees.

STEERE, C. J. In March, 1911, claimants recovered a verdict and judgment in the circuit court of Berrien county against the estate of Frank M. Kelley, deceased, for $1,340.45, as his proportional liability upon a collateral note for $10,000, signed by him and six others, as guarantors for the West Michigan Nurseries Company. Said note was dated February 6, 1903. Said Frank M. Kelley died June 24, 1904. On June 12, 1908, payment having been insisted upon, these claimants, being three of the seven makers of the note, paid to the Farmers' & Merchants' Bank of Benton Harbor, Mich., the holder of said note, the $10,000 demanded, whereupon said note was surrendered to them. On November 1, 1909, they presented a claim for contribution, in the probate court of Berrien county, against the estate of said Frank M. Kelley, deceased, based on the payment by them of said note. The commissioners on claims against said estate allowed their claim at the sum of $2,698.76, and an appeal was taken by the administrator to the circuit court, where

trial by jury was had, resulting in the verdict and judgment above stated. Said administrator thereupon removed the case to this court for review on writ of error.

The note in question was given as collateral to protect a line of credit extended to the West Michigan Nurseries, a corporation in which said Frank M. Kelley and the other signers were interested. The West Michigan Nurseries was organized and incorporated in 1896, having its headquarters at Benton Harbor, Mich.; its nurseries being located at Eau Claire in Berrien county. The claimants herein and said Kelley were all stockholders and directors in said company. Kelley, who was a farmer residing in Berrien county, was a director from the time it was organized until he died. The company borrowed money from time to time for the furtherance of its business and prior to 1903 had obtained a line of credit to the amount of $5,000 from the Farmers' & Merchants' Bank, of Benton Harbor, secured by a collateral note for $5,000 signed by members of the board of directors of said nursery company, among whom was said Kelley. The indebtedness of the company had gradually increased until, in February, 1903, it owed the bank $13,000, and, at the insistence of the cashier of the bank that the loan could not be continued without increased collateral, the directors of the West Michigan Nursery Company gave to the bank the note in question, which is as follows:

"$10,000.          BENTON HARBOR, MICH., Feb. 6, 1903.

"On demand after date I promise to pay to the order of Farmers' & Merchants' Bank ten thousand dollars payable in gold at their office in Benton Harbor, Mich. Value received, with interest at 7 per cent. per annum.

"W. B. MOSHER.
"F. M. KELLEY.
"H. L. BIRD.
"A. C. BIRD."

On the back of said note appears the following indorsement:

"This note is given as collateral to other notes of dif-

ferent amounts and dates made by the West Michigan Nursery Company, favor of Farmers' & Merchants' Bank, Benton Harbor, Mich."

Negotiations for this line of credit were conducted with the bank by H. L. Bird, treasurer of the company. He testified that when these negotiations were had, and after the previous note for $5,000 was given, he fully explained the transaction to the directors of the nursery company, including deceased, and told them it was necessary to borrow money from time to time as the business demanded, that it was difficult and practically impossible to be constantly getting the directors together, and that, for the efficient transaction of business, continued acceptable collateral in sufficient amount to satisfy the bank was required, so that he could have it available whenever needed. After the note in controversy was given, the nursery company continued to do its business at the bank as previously, giving its notes, sometimes making payments on its indebtedness; then again borrowing more and renewing, in whole or in part, whenever its paper at the bank fell due, the bank in the meantime holding the $10,000 note as collateral therefor. The notes given by the company to the bank in the transaction of its business were 90-day paper. This course was continued until January 2, 1906, when all notes then held by the bank against the company, except one secured by other collateral, were substituted by, and their amounts merged into, one note of the company for $14,750. Interest was paid on this note, and it was renewed for the same amount on August 5, 1907.

On June 12, 1908, the nursery company having been found to be insolvent and unable to meet its obligations, after repeated demands and insistence by the bank, which yet continued to hold the $10,000 note as collateral to the company's indebtedness, claimants here, Bedford, Preston, and Bird, took up said note, paying the bank the $10,000, which was thereupon credited by the bank on the $14,750 note of the company. Kelley had then been dead

four years.   When he died, in June, 1904, the nursery
company was a large, prosperous, and growing concern,
and solvent.   It so continued until October, 1906, when a
severe and disastrous freeze destroyed its nursery stock
and entailed immense losses which it was unable to re-
trieve, resulting in insolvency.   No demand was ever
made by the bank upon Kelley or the representatives of
his estate for the payment of this note.   And, so far as
shown, no notice of dishonor of the notes for which this
note was held as collateral, or of any failure on the part
of the nursery company to meet its obligations, was given
to Kelley or his administrator until November 1, 1909,
over five years after his death, when claimants presented
this claim for contribution against his estate in the pro-
bate court.

On February 6, 1903, when this $10,000 note was given,
the bank held 11 notes of the nursery company, of various
dates and amounts, totaling $13,000.   These, being 90-day
paper, were soon retired; most of them being taken care
of at maturity by renewal notes for the same length
of time, upon which interest was paid in advance.   The
history of the company's indebtedness, traced through the
books of the bank and verified by witnesses, show a vary-
ing indebtedness, never less than the $13,000, represented
by a sequence of 90-day notes, one occasionally being
paid at maturity, but most often renewed with advance
interest paid.   Of the original $13,000, claimants trace,
through repeated renewals and changing accounts, $8,250
as continued on until finally merged into the $14,750 note
given January 2, 1906, and later renewed.   While the
note in question was payable on demand and, by the in-
dorsement upon it, was collateral to certain other notes
running for 90 days, "of different amounts and dates,
made by the West Michigan Nursery Company," claim-
ants contend that it was a continuing collateral, which
it is competent to show by evidence of the relations of the
parties, of their previous and subsequent method of deal-

ing, of the explanation given by Bird to his directors of the purpose of the note before they signed it, and by any other pertinent circumstances attending its execution; that, the signers being guarantors, notice of nonpayment by the principal was not necessary in order to hold them liable, and no laches could be imputed to the payee within the period fixed by the statute of limitations.

In behalf of the defense, it is urged that the language of the writing indorsed on the note is plain and unambiguous; that it distinctly confines the guaranty to certain clearly designated, short-time notes then made, and cannot otherwise be construed; that testimony is not competent to contradict its plain terms and show a different oral agreement that it should continue and extend to notes thereafter made; that extending the time of payment by subsequent renewal notes, to run for a definite time, released the guarantors; that even conceding it was a continuing guaranty it was for no fixed period and terminated with Kelley's death so far as he and his interests were concerned, and that further renewals released his estate. Failure to make demand, long delay, and laches are also urged as a defense.

It is conceded to be a general rule that extension of time by the payee to the principal, without consent of the surety or guarantor, releases the latter. While a surety and guarantor are not the same in all respects, they are similar in the particular that each promises to answer for the debt or default of another, the surety assuming liability as a regular party to the primary undertaking, while the guarantor does not, but his liability depends upon an independent, collateral agreement by which he undertakes to pay the obligation if the primary payor fails to do so. The authorities, in discussing certain principles common to both, often use the terms interchangeably.

As to either, an extension of time must, to operate as a release, be more than a mere agreement to indulge or forbear. It must present the essentials of a binding contract,

reasonably definite as to time and for a valid consideration. Payment of interest in advance is a sufficient consideration. *Schnitzler* v. *National Bank*, 1 Kan. App. 674 (42 Pac. 496); *Sweet* v. *Newberry*, 92 Mich. 515 (52 N. W. 1005). In this case there was no express stipulation in the contract of extension that a delay should not affect the right to proceed against the surety at any time. The renewal notes were for an agreed, definite time, 90 days, and interest was paid in advance. The contract at each renewal was a definite, binding one. When the notes were given and advance interest paid, neither the bank nor the guarantors could take any steps to enforce payment until the debt was again due.

It is undoubtedly the law that evidence is competent to show the relations of parties and attending circumstances as an aid in interpreting, or construing, a written instrument which is uncertain and ambiguous. 32 Cyc. p. 40; *Columbus Sewer Pipe Co.* v. *Ganser*, 58 Mich. 385 (25 N. W. 377, 55 Am. Rep. 697); *Big Rapids Nat. Bank* v. *Peters*, 120 Mich. 518 (79 N. W. 891). But this cannot be extended to contradicting its plain provisions.

It is argued and urged by claimants that the indorsement upon the collateral note is not so clear as to preclude construing it to include notes to be made, as well as those already made, in the light of the relations of the parties and the mutual interpretation shown to have been given the instrument both by the bank and the makers of the note themselves. In view of the conclusions reached on other questions involved, we need not determine here whether it was competent to prove that the indorsement according to the understanding of the parties was a continuing guaranty.

Conceding that under the circumstances shown it is to be regarded as a continuing security for a succession of notes given and to be given by the nursery company to the bank, the length of time it should continue is left indefinite. The signers of the collateral note were guarantors, on a separate undertaking, payable on demand.

The security then would continue, covering renewals until some subsequent action of one of the parties terminated it. The bank could terminate it by refusing further extension. The guarantors could revoke the continuing guaranty, nothing in the contract forbidding it, by proper notice to the bank, and extensions thereafter granted would operate as a release. Death of the guarantor, of which the payee has notice, is of like effect. The death of Frank M. Kelley, known to all the parties, was notice to the bank of revocation and terminated the progressive element of the guaranty, at least as to him and his estate. Each renewal of the notes was a new transaction with a new consideration, and when made was indemnified by a continuing and, in effect, renewed, binding promise on the part of the living guarantor. Dead guarantors can make no new promises. We think it well established that the bank had notice of Kelley's death. His business relations with the bank, and position with the company, of which the bank was a heavy creditor, and the fact that he was a well known and prominent man in that community, establish it by strong presumption; but, even if not shown, it would be no unreasonable hardship to require parties dealing in commerical paper to exercise sufficient diligence to ascertain whether the person on whose credit they are taking new notes is living.

"Guaranties have been divided into two classes: one, where the consideration is entire, that is, where it passes wholly at one time; the other, where it passes at different times, and is therefore separable or divisible. The former are not revocable by the guarantor, and are not terminated by his death and notice of that fact. *Calvert* v. *Gordon*, 3 Man. & Ry. 124, 128; *Green* v. *Young* [8 Greenl.], 8 Me. 14, 15, 16; *Moore* v. *Wallis*, 18 Ala. 458, 463; *Royal Ins. Co.* v. *Davies*, 40 Iowa, 469, 471 [20 Am. Rep. 581]; *Lloyds* v. *Harper*, L. R. 16 Ch. Div. 290, 305–307, 313, 314, 317–321; *Rapp* v. *Insurance Co.*, 113 Ill. 390, 394, 395 [55 Am. Rep. 427]. The latter, on the contrary, may be revoked as to subsequent transactions by the guarantor, upon notice to that effect, and are

determined by his death and notice of that event.  *Offord v. Davies*, 12 C. B. N. S. 748, 756, 757; *Jordan* v. *Dobbins*, 122 Mass. 168, 170, 171 [23 Am. Rep. 305]; *Coulthart* v. *Clementson*, L. R. 8 Q. B. Div. 42, 46, 47; *Rapp* v. *Insurance Co.*, 113 Ill. 390, 395, 396 [55 Am. Rep. 427]; *Menard* v. *Scudder*, 7 La. Ann. 385, 391, 392 [56 Am. Dec. 610]." *National Eagle Bank* v. *Hunt*, 16 R. I. 151 (13 Atl. 116).

*Vide*, also, *Gay* v. *Ward*, 67 Conn. 147 (34 Atl. 1025, 32 L. R. A. 818); *Jordan* v. *Dobbins*, 122 Mass. 168 (23 Am. Rep. 305); *Hyland* v. *Habich*, 150 Mass. 112 (22 N. E. 765, 6 L. R. A. 383, 15 Am. St. Rep. 174); *Valentine* v. *Banking Co.*, 133 Cal. 191 (65 Pac. 381).

The guaranty in the case at bar comes within the second class above mentioned.   Death terminated the power of Kelley to act and revoked any authority or license he may have given, not yet executed or acted upon.

One year and four months after  the note was given Kelley died.   If the bank wished to hold the Kelley estate as a guarantor on the collateral note, it was  then its duty to grant no further extensions, but proceed to  collect the notes then in existence when due, or at least within a reasonable time thereafter.   The nursery company's notes were 90-day paper, and the collateral note was due on demand.   The nursery company was then prosperous and solvent,  and continued in that condition  for over two years thereafter.   The bank, by legal and binding contracts, repeatedly extended the time of payment after Kelley's death, accepting  renewal notes for a  fixed time with interest paid in advance, as before, without even notice to  his administrator, and until after  the nurseries company became insolvent and conditions changed to the prejudice of the guarantor's rights.   Not only was Kelley's estate released by the extension of time after his  death in strict operation of law, but by attendant laches which would preclude recovery.   Defendant's counsel requested the trial court to charge the jury as follows:

" It is uncontradicted that, at the time  the collateral

note was given, the West Michigan Nurseries was a solvent corporation with assets sufficient to pay all its debts; that said corporation continued solvent during the lifetime of Frank M. Kelley, and that said corporation continued solvent for more than two years after the death of Frank M. Kelley. And I charge you that a delay on the part of the creditor, the Farmers' & Merchants' Bank, of demanding payment upon the collateral note for a period of more than five years, under the circumstances shown in this record, releases Frank M. Kelley and his estate from liability upon such contract."

It is true that prompt notice of default in payment is not necessary to charge a guarantor, as in case of an indorser; but it is advisable to give such notice inasmuch as it frequently becomes important to prove notice to meet the presumption of laches arising from long delay. 1 Edwards on Bills, p. 241. Delay may, and often does, amount to laches and bar recovery regardless of the statute of limitations. While the guarantor of payment, not a party to the original note, cannot complain of laches, or want of notice, unless it has worked to his prejudice, on the other hand want of due diligence by the payee, which operates to the injury of the guarantor and occasions him loss which he could otherwise have avoided, operates as a release.

While this rule is enforced on less provocation in cases of a guaranty of collection than a guaranty of payment, it is equally applicable to the latter. It has been held that the guarantor is released if the payee fails to make demand, give notice of default, or to take any proceedings to collect for a period of five years. *Shepard* v. *Phears*, 35 Tex. 763. Where the maker, financially responsible when the debt became due, has left the State or subsequently become insolvent, a shorter period of delay is often imputed as laches and discharges the guarantor. *Oxford Bank* v. *Haynes*, 8 Pick. (Mass.) 423 (19 Am. Dec. 334); *Gaff* v. *Sims*, 45 Ind. 262; *Gamage* v. *Hutchins*, 23 Me. 565; *French* v. *Marsh*, 29 Wis. 649; *Withers* v. *Berry*, 25 Kan. 373.

For the reasons heretofore given, we are of opinion that the request quoted should have been given and a verdict directed for the defendant.

The judgment is reversed, and no new trial granted.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.