ARKLA CHEMICAL CORPORATION *v.*
HARRIET L. PALMER, Ex'x

5-5532                                    465 S. W. 2d 335

Opinion delivered April 12, 1971

*Douglas Bradley,* for appellant.

*Tiner & Henry,* for appellee.

GEORGE ROSE SMITH, Justice. This appeal is from the probate court's denial of a claim filed by the appellant, Arkla Chemical Corporation, against the estate of Harry C. Palmer, Jr., deceased. The principal contested issue in the probate court was whether Arkla's claim, which arose from the sale of fertilizer, was (*a*) against Palmer's estate or (*b*) against Palmer Aero Service, Inc., a domestic corporation in which Palmer and his family owned all the stock. The probate judge, in denying the claim, held that Arkla, after Palmer's death, had elected to do

business with the corporation and accordingly had no claim against the decedent's estate. The correctness of that holding is the pivotal issue on appeal.

The facts, as reflected by a voluminous record containing much testimony and many exhibits, must be stated in some detail.

Palmer, during his lifetime, was the owner of an agricultural flying service, which sold seed and fertilizer and dispersed those commodities from airplanes. In 1962 Palmer organized the corporation, Palmer Aero Service, Inc. On the date of Palmer's accidental death in a plane accident, May 28, 1968, the corporation's outstanding 33 shares of stock were owned in the ratio of 30 by Palmer and one each by his former wife (the appellee) and their two children. (The Palmers had been divorced in February of 1968.)

It is shown without dispute that during Palmer's lifetime he was not careful to keep his own affairs separate from those of the corporation. In January of 1968, about four months before Palmer's death, he applied to Arkla for the privilege of purchasing fertilizer on credit. That application was made in the name of the corporation and was accompanied by a corporate financial statement listing assets such as airplanes, trucks, and real estate, that were actually owned by Palmer or by Palmer and his wife. At the same time Palmer executed Arkla's standard form of guaranty, by which he individually guaranteed payment of the account. Counsel for Arkla correctly states in his brief that at the outset it made little difference to Arkla whether the business was corporate or individual, since Arkla had the personal guaranty.

Arkla approved the application for credit and began selling chemical fertilizers to Palmer or to the corporation—a point unquestionably open to some doubt. During the months preceding Palmer's death Arkla's monthly statements were paid with sufficient promptness to enable the purchaser to take the 2% discount allowed for payments within 30 days.

Palmer was killed on May 28, 1968. Representatives of Arkla learned of the accident within a few hours. In a conversation some two weeks later between Arkla's salesman and Mrs. Palmer, who had been named as executrix of the will, it was stated by Mrs. Palmer that she intended to continue to operate the business in the same way as it had been run in the past. On September 5, 1968, Mrs. Palmer as executrix filed a petition in the probate court reciting that Palmer had been the majority stockholder in the corporation and asking for authority "to exercise the controlling interest in Palmer Aero Service, Inc., and to continue the business of said corporation." On the same day the probate court entered an order granting the petition and directing the executrix to exercise the controlling interest in Palmer Aero Service, Inc., and to continue the business of the corporation.

On the date of Palmer's death the business owed Arkla $22,971.86 for fertilizer bought on credit. Arkla's witnesses candidly admitted that the account was promptly paid by the company, in time to obtain the 2% discount. During June, July, and August the company continued to buy from Arkla. Those sales totaled $34,674.16. The company made payments amounting, according to Arkla's witness, to $33,354.76—a figure that includes the $22,971.86 owed at Palmer's death. Most of the checks for those payments are in the record. They were drawn on the corporate bank account, were signed by Mrs. Palmer in the corporate name, and usually contained notations showing that the discount for prompt payment was being taken.

Despite those prompt payments, the business was evidently losing money. (In fact, a trial balance later filed by the executrix showed an operating loss of $57,144.81 for the year 1968, most of which seems to have accumulated after Palmer's death.) On October 7, 1968, Arkla's attorney verified and filed Arkla's claim against Palmer's estate. The original claim was for $25,552.49, but Arkla now asserts that only $17,003.88, with interest, is still due. Attached to the claim as its only exhibit now in the record was a copy of Palmer's

guaranty agreement, which seems to indicate that the claim against the estate was initially based upon that agreement.

On October 16, 1968, the corporation and the estate executed a written agreement with the principal unsecured creditors of the estate. The probate judge, in rejecting Arkla's claim against the Palmer estate, based his conclusion almost entirely upon the language of the agreement. In view of its controlling importance in the case we find it necessary to quote its pertinent language at length:

## AGREEMENT

By this instrument executed . . . the 16th day of October, 1968, Palmer Aero Service, Inc., a corporation . . . and Harriet L. Palmer, Administratrix of the Estate of H. C. Palmer, Deceased, First Parties, and Planters of Pine Bluff, Inc., Arkla Chemical Corporation, Thompson-Hayward Chemical Company and Nipak, Inc., Second Parties, have contracted and agreed as follows:

1. Second Parties are the principal unsecured creditors of Palmer Aero Service, Inc., and, because of accounting practices and intermingling of assets of Palmer Aero Service, Inc., and personal assets of H. C. Palmer in his lifetime, assert claims against the Estate of H. C. Palmer, Deceased, for the same amounts. The balances claimed by Second Parties are as follows:

| | |
|---|---|
| Planters of Pine Bluff, Inc. | $49,398.02 |
| Arkla Chemical Corporation | 24,291.26 |
| Thompson-Hayward Chemical Company | 7,320.03 |
| Nipak, Inc. | 5,868.68 |
| Total | $86,877.99 |

These accounts have not been verified and are subject to correction for errors by either party.

2. It is recognized that Palmer Aero Service, Inc. and the Estate of H. C. Palmer, Deceased, either severally or jointly, have insufficient liquid assets to

liquidate the said debts and that because of the security held by various secured creditors upon the principal assets of the corporation and the estate, any forced liquidation would result in substantial losses both to First Parties and Second Parties. For this reason it is to the mutual interest of First Parties and Second Parties to continue Palmer Aero Service, Inc. as an operating business with the purpose of attempting to recoup previous losses during the 1969 crop season and to place the business in such condition that it may ultimately be operated at a profit.

3. The principal asset of Palmer Aero Service, Inc. consists of certain accounts receivable aggregating, as of October 15, 1968, . . . $39,599.82. In addition, the Estate of H. C. Palmer, Deceased, is the owner of motor vehicles, airplanes and equipment used in the business of Palmer Aero Service, Inc. as set forth in the schedule hereto attached as Exhibit "A" and made a part hereof; said personal property is encumbered in part by security agreements or liens in favor of First National Bank of Poinsett County, Mid-South Grain Company, Citizens Bank of Jonesboro, and Associate Financial Service, some of which liens may be second liens.

4. It is agreed that First Parties will cause an account to be opened in Mercantile Bank of Jonesboro, Arkansas, in the name of Palmer Aero Service, Inc., Trust Account, with signatures authorized by Mrs. Harriet L. Palmer and Erma Brady (a secretary in the office of Frierson, Walker & Snellgrove, Jonesboro, Arkansas), and that eighty per cent (80%) of all collections from the aforementioned accounts receivable aggregating . . . $39,599.82 will be deposited in that account as collected and that the said trust account shall be a trust fund to be divided among the Second Parties pro rata according to the total amount of their respective accounts. The collections of said accounts receivable shall continue until the total collections deposited in said account aggregate thirty per cent (30%) of the total amount of accounts payable to the Second Parties or until all reasonable efforts to collect the said accounts have been exhausted; thereupon, the total amount deposited in the

said account shall be distributed to the said Second Parties pro rata. The funds in the trust account shall be used for no other purpose.

5. The balance of the collections of said accounts receivable shall be deposited to the general account of Palmer Aero Service, Inc. from which the officers of the corporation shall pay the expenses of operating the business and any accounts payable to other creditors, according to their judgment.

6. Harriet L. Palmer, as Administratrix of the Estate of H. C. Palmer, Deceased, will apply to the Probate Court of Poinsett County, Arkansas, for approval of this agreement insofar as the said Estate is concerned and for authority to pledge and encumber all of the personal property of said Estate set forth in Exhibit "A" attached hereto and to execute proper financing statements and security agreements to secure Second Parties, according to their respective interests. The said security agreements and financing statements . . . shall be subject to any existing liens.

7. In consideration of the payments agreed to be made and the security afforded by the preceding paragraph, Second Parties jointly and severally agree that they will withhold and forego any legal action against Palmer Aero Service, Inc. or against the Estate of H. C. Palmer Deceased, to collect their respective accounts until March 31, 1969 . . . .

8. On March 31, 1969, if First Parties have performed the agreements undertaken to be performed by them hereunder, and are able to demonstrate to Second Parties their ability to operate the business of Palmer Aero Service, Inc. during the crop season of 1969, and to make provisions for reasonable payment upon the indebtedness due Second Parties from the operating income of Palmer Aero Service, Inc. during the year 1969, Second Parties agree that they will withhold and forego legal action upon their respective debts until November 15, 1969, upon such terms and conditions as will enable them to receive payments pro rata from the operating

income of Palmer Aero Service, Inc. during the year 1969.

9. Upon the approval of Second Parties of the terms of this agreement, First Parties undertake to present same to the Probate Court of Poinsett County for its approval and thereupon to execute financing statement and security agreement as herein provided. The trust account shall be set up effective upon the date of this agreement irrespective of approval of the Probate Court of Poinsett County, Arkansas, and accounts receivable shall be paid into the said account as collected, independently of other terms of this agreement.

\*    \*    \*

Palmer Aero Service, Inc.
By Harriet L. Palmer
President

Estate of H. C. Palmer, Deceased
By Harriet L. Palmer

Administratrix

FIRST PARTIES

Planters of Pine Bluff, Inc.
By M. Dunklin, Vice President

Ark-La Chemical Corporation
By A. L. Crossland, V. P.

Thompson-Hayward Chemical Company
By _____

Nipak, Inc.
By _____

SECOND PARTIES

Attached to the agreement, as Exhibit "A," was a list of airplanes, trucks, and other personal property.

Mrs. Palmer testified that when her attorneys learned of the agreement they were somewhat upset about it. Even so, Mrs. Palmer performed it at least to the extent of collecting the accounts receivable and sending to Arkla, in February, 1969, a check for $7,287.38, which was exactly 30% of Arkla's corrected claim of $24,291.26. It does not appear, however, that Mrs. Palmer made any attempt to have the agreement approved by the probate court or to execute the security agreements mentioned in paragraph 9 of the contract.

Apparently Arkla did not sell any fertilizer to the Palmer company after the end of the 1968 crop year. On June 17, 1969, Arkla filed a petition in the probate court asking that its claim (in the amount of $17,003.88) be approved either as a Class A claim, on the theory that it arose out of a business conducted by the executrix for the estate, or as a Class C claim, on the theory that it was a debt owed by Palmer at the time of his death and never paid. The probate court, as we have said, disallowed the claim.

The appellant's single point for reversal is that the trial court erred in refusing to allow the claim. Under that broad heading counsel presents a manifold argument that cannot readily be restated or summarized. Counsel's reasoning, however, embraces three basic contentions that must be discussed separately.

First, and primarily, it is argued that Arkla's demand should have been approved as a Class A claim, upon the theory that the corporate entity ought to be disregarded. We agree with the probate judge's conclusion that such a contention is contrary to the proof and to the position taken by the unsecured creditors in the contract which we have quoted.

It is clear from the record that after Palmer's death the unsecured creditors had a choice of courses to follow. Arkla, for example, might have stopped doing business with Palmer Aero Service and have sought instead to collect the account from Palmer's estate. That choice was understandably not attractive to Arkla's manage-

ment, because the assets of Palmer's estate were mortgaged to other creditors. Mrs. Palmer testified without contradiction that everything was mortgaged to the hilt. Paragraph 2 of the contract recognized the realities of the situation by reciting that any forced liquidation would result in substantial losses to all concerned.

As the contract itself stated, the unsecured creditors elected instead to continue doing business with the corporation in the hope that the company could eventually pay its debts. The agreement clearly and unequivocally recognized the separate existence of the corporation and the fact that the trucks, airplanes, and other items of personal property were owned by the estate. Arkla actually received 30% of its claim under the arrangement put into effect by Paragraph 4 of the contract. It is a familiar rule that one cannot take advantage of the favorable terms of an agreement and at the same time disclaim those that prove to be burdensome. *Williams Mfg. Co. v. Strasberg,* 229 Ark. 321, 314 S. W. 2d 500 (1958).

We find no sound basis for the appellant's insistence that the corporate entity should be disregarded. Ordinarily a corporation is a separate and distinct entity from its stockholders. *McCarroll* v. *Ozarks Rural Elec. Co-op. Corp.,* 201 Ark. 329, 146 S. W. 2d 693 (1940). The corporate structure is to be disregarded only when it is illegally abused to the injury of a third person. *Rounds & Porter Lbr. Co.* v. *Burns,* 216 Ark. 288, 225 S. W. 2d 1 (1949).

In the case at bar the executrix was authorized by the probate court to exercise the estate's controlling interest in the corporation and to continue the business of the corporation. Thus the court order itself recognized the separate existence of Palmer Aero Service, Inc., as did the contract with the unsecured creditors. It is unfortunate that the corporation's efforts to continue in business led eventually to its insolvency, but counsel has pointed to no fact in the record supporting the suggestion that the corporate form was illegally abused. To the contrary, all the company's bank statements

and records were open to inspection, but no specific instance of fraudulent conduct has been brought to our attention.

Secondly, it is argued that Arkla's demand should have been allowed as a Class C claim, upon the theory that the debt owed to Arkla by Palmer on the date of his death was never paid. The great preponderance of the evidence, if not the undisputed proof, rebuts that contention. At Palmer's death the business enterprise—individual or corporate—owed Arkla $22,971.86 for fertilizer purchased on credit. Arkla's own witnesses testified that the amount then owing was paid in full after Palmer's death. Here, for example, is the testimony of the claimant's employee, Frank Felts:

Q. On the date of his death, either Harry C. Palmer or Palmer Aero Service, one or the other, owed a considerable amount of money to Arkla Chemical Corporation?

A. Yes, sir.

Q. And that has all been paid?

A. Yes, sir.

Q. In other words, they were paid by invoices, is that right, as they came in?

A. That is correct.

\* \* \*

Q. Every dime, either Harry C. Palmer or Palmer Aero Service owed at the date of his death was paid as per the invoices?

A. Yes, sir.

In view of such testimony the appellant's second argument need not be discussed further.

Thirdly, counsel refers to the guaranty agreement executed by Palmer in January, 1968. That agreement, however, provided that, as to future obligations, it could be terminated at any time by Palmer's giving written notice to Arkla. It is well settled that such a revocable guaranty contract is terminated by the guarantor's death, or, as it is sometimes put, by the other party's knowledge of that death. *First Nat. Bank of Boston* v. *McGowan,* 296 Mass. 101, 5 N. E. 2d 5 (1936); *Bedford* v. *Kelley,* 173 Mich. 492, 139 N. W. 250 (1913); *Tyler Bank & Tr. Co.* v. *Shaw,* 293 S. W. 2d 797 (Tex. Civ. App., 1956). The reasons for the rule were stated with clarity in *Gay* v. *Ward,* 67 Conn. 147, 34 Atl. 1025 (1895):

But, when the guarantee has knowledge of the death of the guarantor, such knowledge works a revocation of the guaranty. The guarantee no longer relies upon the credit of the deceased guarantor. Each advance made by the guarantee constitutes a fresh consideration, and, when made, an irrevocable promise or guaranty on the part of the living guarantors. Each advance thereafter made is upon the credit of the living, not of the dead, guarantor. Were this not so,—unless it be held that the representatives of the deceased may upon notice terminate the guaranty,—the guaranty, terminable at the option of the guarantor during life, becomes, upon his death, never ending. The limitation which the law gives the living is denied the dead. Estates must remain unsettled, devises of property be withheld, so long as the guaranty may last, and the representatives of the deceased guarantor be powerless to save his estate from a loss which neither he nor they authorized or received benefit for. Such a result justifies and impels a court in reading into the guaranty a limitation of termination of the guaranty, upon notice of the death of the guarantor, as well as upon notice from the living guarantor.

In fact, Arkla's form of guaranty contract was apparently drafted with knowledge of the above rule, for it provides that after the guarantor's death the contract may be terminated by the sending of written notice of

the death to Arkla, by registered mail. Here Arkla concededly had actual knowledge of Palmer's death within a few hours after the fatal accident. Thus written notice by registered mail would have supplied no information that the company did not already have.

We should add, in closing, that we are not called upon to decide certain issues mentioned in the appellant's brief. Some complaint is made about Mrs. Palmer's management of the estate, but Arkla, not being a creditor of the estate, is not in a position to raise such an issue. Nor do we express any opinion about Mrs. Palmer's duty to specifically perform the obligations set out in Paragraph 9 of the contract. The probate court is not the proper forum for a suit for specific performance. *Merrell* v. *Smith,* 226 Ark. 1016, 295 S. W. 2d 624 (1956). Indeed, Arkla's counsel was evidently aware of that rule, for at the beginning of the hearing in the court below this statement was made by Mrs. Palmer's attorney: "There is another case pending. It is a chancery case wherein Arkla Chemical sued Mrs. Palmer, the estate, and the corporation. It is an action for specific performance of a contract." All we hold in the case at bar is that the appellant failed to establish a claim against Palmer's estate by a preponderance of the evidence.

Affirmed.