**In re Wilbur GENE and Barbara Lee Campbell, Debtors.**

**Bankruptcy No. SL–96–84260.**

United States Bankruptcy Court,
W.D. Michigan,
Southern Division.

April 17, 1997.

D. Dennis Dudley, Lansing, MI, for Debtors.

John L. Bolenbaugh, Lansing, MI, Trustee.

## OPINION REGARDING THE CLAIM OF JOSEPH S. AND NADEEM S. AJLOUNY, D/B/A MIDWAY PLAZA SHOPPING CENTER [1]

JO ANN C. STEVENSON, Bankruptcy Judge.

This matter came before the Court upon the motion of Debtor Barbara Lee Campbell. She argues that the claim of Joseph and Nadeem Ajlouny should be disallowed in its entirety. The Court disagrees and will allow the claim as filed.

Ms. Campbell was president and sole shareholder of Five–Star Attractions, Inc. ("5–Star"), the video rental store which she operated. On June 15, 1991, 5–Star entered into a three-year lease with landlord Joseph S. Ajlouny, who was doing business as Midway Plaza Shopping Center ("Midway Plaza").[2] The original lease, scheduled to run from July 1, 1991 to June 30, 1994, included the following surety provision:

> In consideration of the letting of [space at Midway Plaza], and for the sum of one dollar to Midway paid I do hereby become surety for the punctual payment of the rent and performance of the covenants in [the lease] to be paid and performed by [5–Star] and if any default shall at any time be made therein do hereby promise and agree to pay unto [Midway Plaza], the said rent and arrears thereof that may be due, and fully satisfy the condition of [the lease], and all damages that may occur by reason of the non-fulfillment thereof, without requiring notice or proof of the de-

mand being made. [Midway Plaza] shall not be held to strict construction adopted in cases of principal and surety. The surety shall not have the right to claim discharge, or plead by way of defense any extension of time given by [Midway Plaza], failure of [Midway Plaza] to give notice of default, receipt by [Midway Plaza] of securities from [5–Star], failure of [Midway Plaza] to pursue [5–Star] and [its] property with due diligence or to apply other remedies and other securities which may possibly be available to [Midway Plaza] and any direct release, unless it be in writing duly authorized and executed.

The surety provision was signed by Barbara Campbell. Although a form affidavit was appended to the agreement, the affidavit was not completed by Ms. Campbell, nor was it notarized.[3]

The original lease, printed on a standardized form, covered insurance, fire, indemnity, and the like, and further provided for a month-to-month tenancy during any period of holdover. In addition, 5–Star was given the right to extend the original lease for another three-year term upon notice to Midway Plaza within 90 days before the expiration of the original term. Under that provision, if 5–Star chose to extend, the rent was to escalate annually but all other provisions of the original lease were to have remained in force unless amended in writing.

The leasing arrangement did not proceed well. Instead, 5–Star quickly accumulated a significant rent arrearage. On December 1, 1993, six months prior to the termination date of the original lease, a Lease Addendum was executed ("the Addendum"). Under the Addendum, the leased square footage was reduced from 3000 to 2000; concomitantly,

---

1. This decision replaces the Court's unpublished opinion and order in this matter, issued March 26, 1997.

2. Joseph Ajlouny signed the original lease as the landlord. While neither Ajlouny signed the Lease Addendum, Promissory Note, and Security Agreement, documents which are discussed *infra*, the financing statement named as the secured parties "Joseph S. Ajlouny and Nadeem S. Ajlouny, d/b/a Midway Plaza Shopping Center." Similarly, the proof of claim at issue was filed by

"Joseph S. Ajlouny and Nadeem S. Ajlouny, d/b/a Midway Plaza Shopping Center." For ease of reference the Ajlounys, the landlord, and Midway Plaza Shopping Center will be referred to simply as "Midway Plaza."

3. While Debtor's counsel expressed concern that the affidavit was not notarized, he represented to the Court that the Debtor's signature, appearing on all of the documents at issue, was authentic.

the monthly rent was reduced from $2,000 to $1,133. The Addendum also included 5–Star's agreement to execute a note for back rent under a "separate agreement." The surety provision from the original lease was nowhere mentioned in the Addendum.

A promissory note for $40,959.97 plus eight percent interest was executed on November 4, 1993. "Five–Star Attractions, Inc. by Barbara Campbell, its President" was the maker, and Midway Plaza was the payee. The note was signed by Ms. Campbell as 5–Star's president, and was secured by 5–Star's assets under a separate Security Agreement. The Security Agreement was signed the same day by Ms. Campbell as 5–Star's president. 5–Star remained in possession of the premises long after the original lease term had expired, but fell further behind in rent. On June 14, 1996, Midway Plaza filed an eviction action in Michigan's 55th Judicial District Court. The Debtor and her husband thereupon filed Chapter 13 on June 24, 1996.

Midway Plaza filed a proof of claim for $54,195.37. The Debtor objected, claiming that the only personal obligation she undertook was as 5–Star's surety under the original lease. She argues that the Addendum, promissory note, and security agreement superseded the surety clause of the original lease in that new terms were included in the latter-executed documents. She contends further that the parties intended the surety agreement to remain in force only under the terms of the original lease. Thus, she was released from the surety obligation. And even if the surety agreement were found to apply outside the original lease, she contends that because Midway Plaza failed to perfect its security interest in 5–Star's collateral, she has no obligation to satisfy the note. Finally, at the March 13, 1997 hearing, the Debtor represented that she entered into the original lease and surety agreement without the advice of counsel.

Midway Plaza counters that the Debtor was not released as surety. According to Midway Plaza, the Debtor was not harmed by the changes effected by the Addendum and attendant documents, and in fact, actively participated in their making. Thus she consented to the changes and cannot claim discharge.

## DISCUSSION

### 1. Jurisdiction and Burden of Proof

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B). Accordingly, the bankruptcy court is authorized to enter a final judgment or order subject to those appeal rights afforded by 28 U.S.C. § 158 in accord with Fed.R.Bankr.P. 8001 and 8002.

On November 18, 1996, Midway Plaza timely filed its proof of claim. *See* 11 U.S.C. § 501(a); Fed.R.Bankr.P. 3002(c). Under Code section 502(a), a properly filed claim is "deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). Further, such a claim is *prima facie* evidence of the validity of its amount. Fed. R.Bankr.P. 3001(f); *see also In re Gantos Stores, Inc.,* 181 B.R. 903, 908 (Bkrtcy. W.D.Mich.1995). An objection, however, rebuts the presumption of validity. *Gantos, supra,* at 908. Once rebutted, the claimant has the burden of establishing the validity of its claim by a preponderance of the evidence. *Id.* The court, upon receiving an objection and after notice and a hearing, determines the amount of the claim as of the date of filing and allows the claim in that amount. 11 U.S.C. § 502(b).

### 2. Michigan Law on Suretyship

At issue in this case is whether the Addendum, secured note, or other acts of the parties relieved the Debtor of her surety obligation under the original lease. Since 5–Star is not in bankruptcy, the Court is concerned only with the extent to which the Debtor's Chapter 13 bankruptcy estate is obligated to the claimants. Whether the Debtor was discharged as a surety is a question of Michigan law since the instruments at issue were executed in Michigan, and the performance due thereunder was to be carried out in Michigan. *See Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979) ('Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.'); *In re Mount Pleasant L.P.,* 144 B.R.

727, 731–32 (Bkrtcy.W.D.Mich.1992) (discusses *Butner*); *see also* 6 COLLIER ON BANKRUPTCY §§ 502.03[1][c], [2][b][ii] (15th ed. rev. 1996) (validity of claims is determined under applicable state or federal law).

■ In general a surety agreement is to be construed like any other written contract: the intent of the parties, as expressed in the language of the instrument, controls. *Jerry McCarthy Foundation v. Winshall*, 372 Mich. 389, 392, 126 N.W.2d 805 (1964); *First State Bank of Holland v. Landwehr (In re Landwehr's Estate)*, 286 Mich. 698, 702–03, 282 N.W. 873 (1938); *see also Purlo Corp. v. 3925 Woodward Avenue, Inc.*, 341 Mich. 483, 487–89, 67 N.W.2d 684 (1954) (discusses rules of construction for leases, deeds). A surety agreement, as a "promise to answer for the debt . . . of another" must be in writing and signed to be enforceable. *See* M.C.L.A. § 566.132(1)(b). In construing any written contract, the entire instrument and all its parts must be considered. *Purlo Corp., supra*, at 487, 67 N.W.2d 684. If possible the Court should harmonize all expressed language so as to make the entire instrument meaningful; it should not excise any language needlessly. *Id.* Parol evidence may be considered in order to aid the court in construing an ambiguous instrument, but such evidence should not be heard where the provisions are clear and plain. *Id.; Miller Industries, Inc. v. Cadillac State Bank*, 40 Mich.App. 52, 55, 198 N.W.2d 433 (1972); *In re Lansing Clarion L.P.*, 132 B.R. 845, 849 (Bkrtcy.W.D.Mich.1991).

■ We begin by noting that the Debtor was a "surety" as opposed to a "guarantor." Often the terms are used interchangeably, even in the cases, but in Michigan sureties and guarantors are legally distinguishable. While both agree to satisfy a debt in the event of the principal obligor's default, only the surety is obligated with the principal under the primary agreement. *First Nat'l Bank & Trust Co. of Ann Arbor v. Dolph*, 287 Mich. 219, 225, 283 N.W. 35 (1938). Thus a surety is immediately and primarily liable upon the default of the principal. *Preston v. Huntingdon, et al.*, 67 Mich. 139, 141, 34 N.W. 279 (1887);[4] *Hunters Pointe Partners L.P. v. United States Fidelity & Guaranty Co.*, 194 Mich.App. 294, 298 n. 2, 486 N.W.2d 136 (1992). A guarantor, on the other hand, enters into an "independent, collateral agreement" of guaranty, becoming only secondarily liable upon the principal obligor's default. *First Nat'l Bank & Trust Co., supra*, 287 Mich. at 225, 283 N.W. 35. In this case, the original lease and the surety agreement were signed the same day. In fact, it is undisputed that the surety provision was printed on the back of one of the pages of the original lease. We find that 5–Star's agreement to lease and Ms. Campbell's agreement to answer for 5–Star's default under the lease constitute one undertaking. The Debtor thus qualifies as a surety.

■ A further distinction must be noted: paid sureties operate under rules separate from those governing gratuitous sureties. While a gratuitous surety will be released following any alteration in the principal's original obligation, a paid surety must show that such an alteration was material and that it resulted in harm to the surety. *First State Bank of Holland, supra*, 286 Mich. at 705, 282 N.W. 873; *Ramada Development Company v. United States Fidelity & Guaranty Co.*, 626 F.2d 517, 521 (6th Cir.1980) (Michigan law); *Rose v. Ramm*, 254 Mich. 259, 261–62, 237 N.W. 60 (1931); *Grinnell Realty Co. v. General Casualty Surety Co.*, 253 Mich. 16, 22, 234 N.W. 125 (1931); *Hunters Pointe Partners, supra*, 194 Mich.App. at 297–98, 486 N.W.2d 136; *Miller Industries, Inc. v. Cadillac State Bank, supra*, 40 Mich.App. at 59, 198 N.W.2d 433 (1972). A substitution of obligors, for example, may result in a paid surety's release. *See Howard v. Lud*, 119 Mich.App. 55, 60, 325 N.W.2d 623 (1982) (*citing Farmers Cooperative Creamery Co. v. Huhn*, 241 Mich. 23, 27, 216 N.W. 370 (1927); *Miller Industries, supra*, 40 Mich.App. at 58, 198 N.W.2d 433). The rationale behind the general rule regarding paid sureties is that a material

**4.** The *Huntingdon* court found that a personal guaranty of payment of rent upon the default of the lessee, under a written provision substantially similar to the one at issue here, was a single obligation which included a surety agreement. 67 Mich. at 141–42, 34 N.W. 279.

change in the principal's obligation "has the effect of creating a new contract to which the surety never intended to become liable." *Id.*

■ However, even a gratuitous surety will not be released if it consented to changes in the underlying obligation. *Realty Construction Co. v. Kennedy,* 234 Mich. 490, 495, 208 N.W. 455 (1926); *Chris Nelson & Son, Inc. v. Michigan Corp.,* 84 Mich.App. 29, 32–33, 269 N.W.2d 295 (1978); *Wilson Leasing Co. v. Seaway Pharmacal Corp.,* 53 Mich. App. 359, 369–70, 220 N.W.2d 83 (1974).

■ Ms. Campbell falls within the class of paid sureties. As is clear from the language of the surety clause, Ms. Campbell undertook her surety obligation in return for consideration, to wit "the letting of the premises in the foregoing instrument described...." In becoming a surety the Debtor had a business purpose, not a purely personal one. In similar cases Michigan courts have termed such sureties as paid, not gratuitous. *See First State Bank of Holland, supra,* 286 Mich. at 705, 282 N.W. 873; *Rose v. Ramm, supra,* 254 Mich. at 261–62, 237 N.W. 60 (paid surety rules apply to individual who receives consideration for surety obligation, as well as to commercial sureties). Therefore, it is the Debtor's burden to show that she should be absolved of her surety obligation due to 1) a material change in the original lease; 2) which adversely affected her as a surety.

■ The parties did not mention the surety arrangement from the original lease anywhere in the Addendum, the note, or the security agreement. However, under the original lease the Debtor agreed that she would "not have the right to claim discharge [of the surety obligation] ... unless it be in writing duly authorized and executed."[5] No

such writing was ever produced for the Court.

The Court has considered this clause and, upon reading it along with all the documents at issue, is convinced that none of the provisions in the latter-executed instruments upset the original surety obligation. Instead, those instruments evidence the parties' intention that Ms. Campbell. act as . surety throughout the period of 5-Star's occupancy of Midway Plaza.

To begin with, in the Debtor's listing of the "new terms" added to the latter-executed instruments, she has failed to show that any change adversely affected her as a surety. The Debtor's surety position was not harmed by the execution of a secured note for back rent. On the contrary, that change benefitted Ms. Campbell as surety, since Midway Plaza's execution of the security agreement gave it the option of looking to 5-Star's collateral for satisfaction, whereas previously Midway Plaza was merely an unsecured creditor. At the same time, Ms. Campbell's personal financial risk was reduced, not increased, when the secured note was executed. *See First State Bank of Holland, supra,* 286 Mich. at 705–06, 282 N.W. 873.[6]

The Debtor cannot rely upon *Shurlow v. Bonthuis,* 218 Mich.App. 142, 553 N.W.2d 366 (1996), nor on *National Bank of Detroit v. Alford,* 65 Mich.App. 634, 237 N.W.2d 592 (1976), cited in *Shurlow.* In *Shurlow,* a commercial lease included a corporate officer's guaranty against the principal's default along with the principal's pledge of collateral in a secured transaction. The obligee failed to perfect the security interest. The corporation defaulted and filed bankruptcy, wherein the bankruptcy trustee's interest was given priority over the obligee's unsecured lien. The obligee then sued the guarantor. The Court of Appeals, affirming the trial court,

---

**5.** Orig. Lease, surety agreement.

**6.** The rule stated in *First State Bank of Holland, supra,* is:

'The taking of additional or substituted security such as a bond, bill, or note, by the person in whose favor the guaranty operates does not release the guarantor, for it in no way changes his contract and is not to his injury, especially where such security is given expressly for the guarantor's benefit; unless in connection with

the giving of such security there is, without the guarantor's consent, an extension of time for payment or performance, or unless it is accepted in payment and discharge of the original obligation. A guarantor who signs a guaranty expressly authorizing an extension of time for payment or performance is not released by the taking of additional security as a consideration for such extension.'

*Id.* (citation omitted).

held that the obligee's negligence in failing to perfect the security interest had damaged the guarantor, and that the guarantor was released. *Shurlow, supra,* 218 Mich.App. at 148–49, 553 N.W.2d 366; *see also* M.C.L.A. § 440.9207(3) (secured party liable for loss caused by failure to perfect security interest). Similarly, in *National Bank of Detroit, supra,* it was held that the obligee's failure to record a security interest in the principal's assets had damaged the guarantor, and that the guarantor was released. *National Bank of Detroit, supra,* 65 Mich.App. at 637–38, 237 N.W.2d 592.

In contrast, Ms. Campbell became a surety under the original lease, an instrument which included no pledge of 5–Star's collateral as security. As mentioned *supra,* 5–Star's subsequent granting of a security interest in its collateral to Midway Plaza clearly *improved* Debtor Campbell's position as surety. Even assuming the security interest went unperfected, Ms. Campbell would be rendered no worse off than she was under the original lease.[7] Unlike in *Shurlow* or *National Bank of Detroit,* Midway Plaza's alleged failure to perfect its security interest did not result in damage to the Debtor and thus, cannot form the basis for her release as surety.

Now it is true that under the secured note 5–Star agreed to pay interest on the back rent, but that new obligation does not amount to a material change in the principal's obligation. Compare *Shurlow v. Bonthuis, supra* (security holder negligently failed to perfect landlord's lien, holder's claim deemed unsecured in bankruptcy, held: guarantor discharged), and *Fassett v. Deschutes Enterprises, Inc.,* 69 Or.App. 426, 432, 686 P.2d 1034, *rev. denied,* 298 Or. 150, 690 P.2d 506 (1984) (monthly rent increased by $550 without guarantor's consent, held: guarantor discharged), with *Equitable Surety Co. v. U.S.,* 234 U.S. 448, 34 S.Ct. 803, 58 L.Ed. 1394 (1914) (departure from building

contract did not release surety); *Ramada Development Company, supra* (principal, by paying subcontractor for work not yet completed, departed from principal obligation, but change was immaterial and benefitted surety; held: surety not discharged); and *Doyle v. Faust,* 187 Mich. 108, 153 N.W. 725 (1915) (changes in performance of building contract were contemplated under the contract and in any event immaterial, held: surety not discharged). The Debtor has cited no authority to convince the Court otherwise, nor did additional research uncover any analogous case to support the Debtor's claim.

Even if another court might conclude that the addition of interest on the rent arrearage constituted a material change which caused injury to the surety, we would emphasize that the Debtor consented to the changes wrought by the Addendum and note. Ms. Campbell never raised the issue of the discharge of her surety obligation until she filed bankruptcy. For that reason alone the Debtor could be denied a release. *See, e.g., Realty Construction, supra,* 234 Mich. at 495, 208 N.W. 455. Clearly, 5–Star's agreement to pay interest on the rent arrearage did not "have the effect of creating a new contract to which the surety never intended to become liable." *See Howard v. Lud, supra,* at 60. As stated earlier, the original lease provided that Ms. Campbell's surety obligation would only be released pursuant to a written agreement. No such agreement was produced for the Court. Finally, while the Debtor argues that the surety provision was expressly limited to the original lease, the Court finds no language to that effect in the original lease or elsewhere, nor did the Debtor bring any such language to the Court's attention.

### 3. The Holdover Tenancy

The Court has already ruled that the surety provision should be considered a part of the original lease. But because 5–

---

7. In fact, an unperfected security interest may retain priority over certain creditors. *See* M.C.L.A. §§ 440.9201 (validity of security agreements generally), 440.9301 (priorities); *see also Turbinator, Inc. v. U.S. Windtricity, Inc.,* 33 Cal. App.4th 443, 39 Cal.Rptr.2d 342, 345 (1995) (decided under California's version of the U.C.C., substantively similar to Michigan's) (unperfected

security interest is enforceable against all parties unless the holder of a later-acquired interest gains priority); *Brown v. Yousif,* 445 Mich. 222, 228, 517 N.W.2d 727 (1994) (subsequent claimant's knowledge of unperfected security interest will result in subordination of claimant's interest under M.C.L.A. § 440.9301(1)(d)).

Star held over in possession of the leased premises after the expiration of the three-year term, the issue arises as to whether the surety agreement remained in effect during the holdover period. To resolve this issue we consult Michigan landlord/tenant law.

Both the original lease and the Addendum contained holdover provisions under which a month-to-month tenancy would result in the event 5–Star held over. However, neither of the holdover provisions mentioned the terms under which the month-to-month tenancy would operate, if one arose.[8] Under Michigan law, "when a tenant under a valid lease for years holds over, the law implies a contract to renew the tenancy on the same terms for another year." *Wagner v. Regency Inn Corp., et al*, 186 Mich.App. 158, 168, 463 N.W.2d 450 (1990) (citation omitted). While none of the express provisions of the Addendum supplanted the surety provision of the original lease, the Court finds that the surety provision was one of those which remained in place during the holdover period.

The Debtor is not aided by *Glocksine v. Malleck*, 372 Mich. 115, 125 N.W.2d 298 (1963), which may be read to modify the rule that a holdover tenancy impliedly operates under the same terms as those contained in the lease. The *Glocksine* court instructed that,

> the law in this State is not that the terms on which a holdover tenant holds are necessarily the same as those of the lease, but rather that the terms of the original tenancy may be inquired into to determine the terms of the holdover tenancy.

372 Mich. at 120, 125 N.W.2d 298. Applying that instruction in this case, the Court finds that the surety agreement is within the terms of the holdover tenancy.

In *Glocksine*, a five-year lease gave the tenant an option to purchase the premises at a fixed price upon the landlord's death. The tenant held over after the expiration of the lease term. Thereafter the landlord died, and the holdover tenant sought to exercise the option. The trial judge held for the

tenants but the Supreme Court reversed, first citing the rule that "an option to purchase is ... nearly always intended to be of limited duration." *Id.* at 118, 125 N.W.2d 298 (citation omitted). The Court then concluded that the parties intended to limit the availability of the option to the original lease term. The issue became whether the option was exercisable during the holdover tenancy as a matter of law. The Court held that it was not, relying on cases from Michigan and elsewhere for its ruling that options to purchase are not among those lease provisions which should be implied as part of a holdover tenancy. *See, e.g., Wanous v. Balaco*, 412 Ill. 545, 547, 107 N.E.2d 791, 792–93 (1952).

Nothing in *Glocksine* or any other Michigan case suggests that the surety clause in the lease at issue should be so treated. By the Court's reading of the instruments, the parties did not intend to upset the paid suretyship by amending the lease and securing the obligation for back rent. Nor, as discussed *supra*, did the Debtor show a material and detrimental change in her position following the amendment of the original lease, as would be required to release her under surety law. Moreover, as president and sole shareholder of 5–Star, Ms. Campbell was the person in control of the corporation's actions. Accordingly, it is disingenuous for her now to argue that by causing 5–Star to hold over, she should be discharged from her responsibilities as surety. We see no reason to exclude the surety arrangement from the implied terms of the holdover tenancy.

### 4. The Debtor Was Without Legal Counsel When the Original Lease Was Executed

Counsel for the Debtor noted that his client was not represented by an attorney during the making and executing of the original lease.[9] However, the fact that one party to a contract had legal counsel while the other did not will not, without more, invalidate a contract. *Foshee v.*

---

8. An option to renew the lease under the same terms (except for the rental rate) was included in the original lease, but was not exercised. *See* Orig. Lease, ¶ 16.5.

9. Ms. Campbell admitted that she was represented during the negotiation and execution of the Addendum, note, and security agreement, however.

*Krum,* 332 Mich. 636, 645, 52 N.W.2d 358 (1952). Debtor's counsel did not claim that Ms. Campbell was unduly influenced or defrauded in any way by the landlord, nor that anyone encouraged her to sign the lease without first consulting an attorney, nor that she lacked the legal capacity to enter a lease. Thus, Ms. Campbell's lack of legal representation is immaterial.

FOR THE FOREGOING REASONS, the Debtor's Objection to Claim is dismissed and the Claim of Joseph and Nadeem Ajlouny is allowed as filed.