**HARLEY J. ROBINSON TRUST,**
**a Michigan Trust, Plaintiff,**

v.

**ARDMORE ACRES, INC., a Michigan corporation; United States of America; State of Michigan; and Michigan Employment Security Commission, Defendants.**

No. 96–74182.

United States District Court,
E.D. Michigan,
Southern Division.

March 31, 1998.

---

**15.** MacGregor Affidavit, ¶ 10.

**16.** MacGregor Affidavit, ¶ 10.

**17.** *Id.* at ¶ 11.

Phillip E. Seltzer, Lipson, Neilson, Jacobs, & Cole, P.C., Troy, MI, for Plaintiff.

John A. Lindquist, U.S. Department of Justice, Tax Division, Washington, DC, for Defendants.

## OPINION AND ORDER

COHN, District Judge.

### I.

This is an action to foreclose on real property. Plaintiff Harley J. Robinson Trust (the Trust) sued Ardmore Acres, Inc. (Ardmore), the United States of America, the State of Michigan,[1] and the Michigan Employment Security Commission, all of which claim an interest in the real property. The Trust guaranteed a loan from Comerica Bank (Comerica) to Ardmore, which was secured by a mortgage on the real property. The Trust says that because it satisfied its obli-

---

1. Under the Order of May 20, 1997, the Trust's interest is prior and superior to the State of Michigan's interests in the property. The State of Michigan has been dismissed.

gation as guarantor, it is entitled to foreclose on the real property.

The Trust has moved for summary judgment against the United States (the government), asserting that its interest in the real property is superior to that of the government, which claims an interest through tax liens. Specifically, the Trust argues that by satisfying its obligation as guarantor of the mortgage, it should be equitably subrogated to the rights of Comerica. The government also moves for summary judgment, asserting that its tax liens are entitled to a priority interest in the real property because the tax liens arose prior to the Trust's interest. The Trust also has filed a motion for leave to amend its complaint and add party defendants.[2]

For the reasons that follow, the Trust's motion for summary judgment will be granted in part and denied in part. The government's motion will be denied.

## II.

The material facts as gleaned from the papers follow.[3]

### A.

In June 1988, Ardmore executed a promissory note secured by a mortgage on the real property in favor of Comerica in exchange for a loan of $2,400,000. The loan was also secured by a guaranty agreement executed by the Trust. The guaranty agreement states in part:

> The [Harley J. Robinson Trust], for value received, unconditionally guarantee(s) to Comerica Bank–Detroit ... payment when due, whether by acceleration or otherwise,

of all existing and future indebtedness to the Bank ... of Ardmore Acres, Inc. ...

Comerica properly recorded the mortgage.

### B.

In September 1993, January 1994, and August 1994, the Internal Revenue Service (IRS) recorded Notices of Federal Tax Lien against Ardmore for assessed but unpaid employment tax liabilities arising out of Ardmore's operation of a nursing home. In June 1994, the IRS levied upon and seized the real property in an effort to collect Ardmore's unpaid taxes which totaled over $1,125,000.

### C.

Ardmore defaulted on the Comerica loan. In February 1993, Comerica sued the Trust[4] as guarantor to collect the unpaid balance of the loan.[5] Eventually, in July 1994, after two of the tax liens were recorded, Comerica and the Trust executed a settlement agreement.

According to the terms of the settlement agreement, the Trust agreed to pay Comerica $2,350,000 to satisfy its obligations under the guaranty agreement. Specifically, the Trust agreed to pay $1,000,000 when the settlement agreement was executed, and $1,350,000 in January 1995. In the settlement agreement, the parties stated that the Trust's payment to Comerica did not satisfy Ardmore's obligation. The settlement agreement further stated that in consideration for the Trust's agreement to satisfy its guaranty obligation, Comerica agreed to sell and assign its rights under the note and mortgage to the Trust. Comerica initially delivered the note and mortgage to an escrow agent, and after the Trust made all of the required payments to Comerica, the agreement pro-

---

**2.** The Trust's purpose in amending the complaint is to comply with the particularity requirements of 28 U.S.C. § 2410 because it has not identified Ardmore's complete address and has not identified the Internal Revenue Offices that filed the notices of federal tax lien. Also, after a title search, the Trust found that Henry Woodworth, Mamound Darbragh, and Robert Niccolini have filed claims of interest against the real property. The government concurs in the motion.

**3.** The Trust did not follow the Court's guidelines for a summary judgment motion.

**4.** Comerica sued the Trust in state court. Comerica also sued other related parties in an effort to obtain payment on other loans. Comerica made no effort to foreclose on the mortgage.

**5.** In response to Comerica's motion for summary disposition in state court, the Trust argued that Comerica should marshal its security under the loan apparently in a belief that marshaling would relieve or ameliorate its obligation to Comerica.

vided that Trust would receive the note and mortgage from the escrow agent.

Comerica and the Trust modified the settlement agreement in January 1995 to provide that the Trust would pay $100,000 in January 1995, and $1,270,000 by March 3, 1995. The payment of $1,270,000 was made on March 15, 1995, twelve days late, from proceeds of the sale of assets of Harley's Golf Course, Inc. (Harley's Golf Course). The Trust says that at the time Harley's Golf Course owed the Estate of Harley Robinson approximately $1,400,000, and the Trust was the residuary beneficiary of the Estate of Harley Robinson.[6] Therefore, the Trust says that payment was made by Harley's Golf Course directly to Comerica on behalf of the Trust for the sake of convenience. Because the guaranty obligation was satisfied, the mortgage and note were delivered by the escrow agent to the Trust, which properly recorded it.

### D.

The IRS sent an inquiry to Comerica to determine the outstanding balance owed by Ardmore in March 1995. The government says Comerica answered that the balance was about $300,000.[7] Shortly thereafter, the IRS levied upon Harley's Golf Course for the Estate of Harley Robinson's unpaid estate tax liability of over $1,300,000. The IRS says that it levied on the same day that the $1,270,000 was wired to Comerica from the sale of Harley's Golf Course to satisfy the Trust's obligation under the settlement agreement.

### III.

The Trust sued Ardmore to recover the amount it paid to satisfy the guaranty obligation. The Trust named, among others, the government as a defendant, requesting that the Court find that the Trust's interest has priority over the competing interests.

The Trust moves for summary judgment, arguing, among other things, that because it

satisfied the guaranty obligation, it should be equitably subrogated to the rights of Comerica. The government also moves for summary judgment, asserting that because its tax liens arose prior to the delivery of the mortgage to the Trust, the tax liens have priority over the Trust's interest in the real property.

### A.

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In so doing, the Court "must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101 (6th Cir.1995).

### B.

█ The Trust argues that it should be equitably subrogated to the rights of Comerica pursuant to 26 U.S.C. § 6323(i)(2) because it satisfied the guaranty obligation. Although state law defines the nature of a taxpayer's interest in real property, federal law governs the priority of a federal tax lien over competing interests in real property. *See United States v. National Bank of Commerce*, 472 U.S. 713, 722, 105 S.Ct. 2919, 86

---

**6.** Apparently, Robinson died before this dispute arose.

**7.** In July 1995, in response to a second inquiry by the IRS, Comerica said that it did not know

the outstanding balance because Comerica sold the note and assigned the mortgage and related documents to the Trust.

L.Ed.2d 565 (1985). The government filed its tax lien pursuant to 26 U.S.C. § 6321:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

*Id.* According to 26 U.S.C. § 6323(a), Comerica's interest in the real property had priority over the tax liens:

> The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary.

*Id.; see also First of America Bank—West Michigan v. Alt,* 848 F.Supp. 1343, 1347 (W.D.Mich.1993) (stating that a "tax lien has priority if it was recorded first"). The government argues that because the Trust's interest in the real property arose after the tax liens were recorded, the tax liens are entitled to priority over the Trust's interest.

If the Trust was subrogated to Comerica's rights, however, the Trust would have an interest superior to the tax liens:

> Where, under local law, one person is subrogated to the rights of another with respect to a lien or interest, such person shall be subrogated to such rights for purposes of any lien imposed by section 6321 or 6324.

26 U.S.C. § 6323(i)(2).

The doctrine of equitable subrogation has been used by courts to allow an interest arising after a federal tax lien to be subrogated to the rights of a prior, senior lienholder. In *Dietrich Industries, Inc. v. United States,* 988 F.2d 568 (5th Cir.1993), the original owner of real property executed a deed of trust on real property in favor of Broadlands Limited (Broadlands) to secure a $2,000,000 debt. Subsequently, the IRS filed two federal tax liens on the property. Shortly thereafter, Dietrich Industries (Dietrich) purchased the property from the original owner for $385,000. Proceeds from the sale of about $320,000 were paid to Broadlands in consideration for Broadlands's release of its lien.[8] *See id.* at 570.

A dispute thus arose as to who had a priority interest in the real property because Dietrich claimed that it should be subrogated to Broadlands's status as senior lienholder. The Court of Appeals for the Fifth Circuit examined Texas subrogation law, where the general rule is that "any person who pays the debt of another to protect her own interest in property is entitled to subrogate to the rights of the creditor whose claim was paid. This rule extends to purchasers who pay an existing mortgage debt as a part of the purchase transaction." *Id.* at 571 (citations omitted). Accordingly, the Fifth Circuit held that Dietrich was entitled to subrogate to Broadlands's status as senior lienholder and thus obtain priority over the federal tax liens. *See id.* at 572.

Other courts also have found equitable subrogation applicable in this context. *See Mort v. United States,* 86 F.3d 890, 893 (9th Cir.1996) (holding that party was entitled to priority over tax lien because "the doctrine of equitable subrogation allows a person who pays off an encumbrance to assume the same priority position as the holder of the previous encumbrance"); *United States v. Baran,* 996 F.2d 25, 29 (2d Cir.1993) (vacating a district court's judgment because it failed to recognize that it had discretion under New York law to apply equitable subrogation in determining priority of tax lien).

### C.

■ No court has published an opinion applying Michigan equitable subrogation law to determine the priority of a tax lien. Further, Michigan courts have not been recently confronted with a situation to apply equitable subrogation where a guarantor satisfied its obligation under a guaranty agreement. Nevertheless, the policy underlying Michigan's equitable subrogation doctrine indicates that equitable subrogation should be applied in this case.

---

**8.** Dietrich had no knowledge of the tax liens when it purchased the property.

In *In re Air Crash Disaster*, 86 F.3d 498 (6th Cir.1996), the Court of Appeals for the Sixth Circuit, in its thorough examination of Michigan equitable subrogation law, noted that:

> The doctrine of equitable subrogation benefits from the flexibility of application that is characteristic of all equitable remedies. The doctrine is "broad enough to include every instance in which one party pays the debt for which another is primarily answerable." Notions of "equity and good conscience" should guide a court's application of the doctrine. Subrogation is an important device for "placing the economic responsibility for injuries on the party whose fault caused the loss." The doctrine "prevent[s] unjust enrichment by assuring that the person who in equity and good conscience is responsible for the debt is ultimately answerable for its discharge."

*Id.* at 549 (citations omitted).[9]

Older Michigan case law also indicates that the Trust should be subrogated to Comerica's status. In *Myres v. Yaple*, 60 Mich. 339, 27 N.W. 536 (1886), the plaintiff signed a ninety-dollar note in favor of a creditor as a surety at the behest of the purchaser of a carriage. Subsequently, the carriage was sold by the creditor, with the consent of the purchaser, to the defendant by way of another note for fifty dollars. The creditor then called upon the plaintiff for payment of the balance because the original purchaser had left the state. The plaintiff paid the balance, and the note was delivered to him.

The plaintiff then sought possession of the carriage from the defendant, or alternatively, reimbursement for his payment of the balance on the original note. The plaintiff claimed that, because he paid the balance on the original note and received possession of the note, he was entitled to the same right to recover as the original creditor. The Michigan Supreme Court stated that

> when the plaintiff, as such surety, was obliged to pay, and did pay, the debt of the

[original purchaser], an equity arose in his favor, by which he was entitled to have all the securities which [the original creditor] held against the person or property of [the original purchaser] transferred to him, and to enforce such securities as fully as [the original creditor] could have done; and, for the purpose of obtaining indemnity from the [original purchaser], he must be considered as at once subrogated to all the rights, remedies, and securities of the original creditor.

*Id.* at 344, 27 N.W. 536. The court thus held that the defendant, who received the carriage with the original purchaser's consent and knew of the plaintiff's surety agreement, was required to give possession of the carriage to the plaintiff. *See id.* at 345, 27 N.W. 536.

Although equitable subrogation has not been applied to the specific context of this case—namely, when an obligation under a note was satisfied by a guarantor trust whose settlor was also the sole shareholder of the obligor corporation—the doctrine indicates that the Trust is entitled to be subrogated to Comerica's status. Indeed, equitable subrogation is a doctrine that "is broad enough to include every instance in which one party pays the debt for which another is primarily answerable." *Allstate Ins. Co. v. Snarski*, 174 Mich.App. 148, 154, 435 N.W.2d 408 (1988).

Moreover, allowing the Trust to be subrogated to Comerica's status does no injustice to the government. When the tax liens were filed, they were junior to Comerica's interest. Allowing the Trust to subrogate to Comerica's position thus leaves the government in the same position as it was when it filed the tax lien. "If equitable subrogation is denied, however, the government will receive a windfall, moving up to a better position than it originally had." *Mort*, 86 F.3d at 895; *see also Dietrich Industries*, 988 F.2d at 573 ("Denying subrogation in this case would give the government an unearned

---

**9.** Although *In re Air Crash Disaster* is a tort case, equitable subrogation is not limited to tort cases. Indeed, Michigan courts have applied the doctrine in a variety of situations, including several insurance contract cases, and as discussed below, in the setting of a surety agreement. Further, as set forth in *Dietrich Industries*, *Mort*, and *Baran*, application of equitable subrogation is proper in the context of this case.

windfall in that it would elevate the government's liens for no good reason.").

### D.

The remaining question is whether the Trust, whose settlor was the sole shareholder of the primary obligor, was "primarily liable" on the note so as to preclude the application of equitable subrogation. *See Michigan Hosp. Serv. v. Sharpe*, 339 Mich. 357, 373–74, 63 N.W.2d 638 (1954) (finding that a party who is primarily obligated cannot use equitable subrogation to recover from other parties).

The government argues that the Trust, as guarantor of the loan to Ardmore, was "primarily obligated" to Comerica, citing *Rassette v. Jacobson*, 39 Mich.App. 172, 197 N.W.2d 330 (1972). In *Rassette*, Motor City Vendors, Inc. (Motor City) purchased all of the outstanding shares of capital stock of another company. A promissory note and a security agreement as part of the payment for the shares were guaranteed by all officers and directors of Motor City, including the defendant. Subsequently, Motor City defaulted on the note, and the plaintiff sued the guarantors, demanding payment in full. The defendant argued that because the plaintiff failed to take possession of the collateral before suing the guarantors, the plaintiff had discharged the defendant as guarantor. *See id.* at 173–74, 197 N.W.2d 330. The Michigan Court of Appeals rejected the defendant's argument, stating that because the defendant was a guarantor pursuant to Mich. Stat. Ann. § 19.3416,[10] "[h]is liability was the same as a co-maker," [11] and thus the plaintiff did not have a duty to take the collateral before seeking payment from the guaran-

tors.[12] *Rassette*, 39 Mich.App. at 175, 197 N.W.2d 330.

The government's reliance on *Rassette* to support the proposition that the Trust was primarily liable misconstrues the guarantor's obligation in this case. The question here is essentially whether the Trust was a "guarantor" or a "surety" under Michigan law. Although the terms are often used interchangeably, "in Michigan sureties and guarantors are legally distinguishable." *In re Campbell*, 207 B.R. 861, 865 (Bankr.W.D.Mich.1997); *see also Bedford v. Kelley*, 173 Mich. 492, 498, 139 N.W. 250 (1913) (cited in *First Nat'l Bank & Trust Co. of Ann Arbor v. Dolph*, 287 Mich. 219, 225, 283 N.W. 35 (1938)). Michigan law defines a "guarantor" as a party that "enters into an 'independent, collateral agreement' of guaranty, becoming only secondarily liable upon the principal obligor's default." *In re Campbell*, 207 B.R. at 865 (quoting *Dolph*, 287 Mich. at 225, 283 N.W. 35). As opposed to a guarantor, a "surety" is a party that is "obligated with the principal under the primary agreement." *Id.* Although both a guarantor and a surety "agree to satisfy a debt in the event of the principal obligor's default," it is only the surety that is "immediately and primarily liable upon the default of the principal." *Id.*

Specifically, in *Dolph*, the defendants were found to be sureties. *See Dolph*, 287 Mich. at 225, 283 N.W. 35. Although the agreement stated that the defendant "guaranteed" payment, it also stated that "the obligation hereunder shall be absolute and primary and performable on demand." *Id.* at 221–22, 283 N.W. 35. Also, in *Campbell*, the debtor was held to be a surety, *see Campbell*, 207 B.R. at 865, where the surety provision was printed on the back of the original lease document,

---

**10.** Mich. Stat. Ann. § 19.3416 is part of Article 3 of the Uniform Commercial Code (UCC), which governs negotiable instruments, and has been revised since *Rassette*. In the papers, each of the parties discuss why the revision of Article 3 may or may not render the holding in *Rassette* obsolete. The *Rassette* opinion, however, does not mention equitable subrogation. Further, neither party affirmatively states whether Article 3 of the Uniform Commercial Code is applicable to this dispute.

**11.** Under the Michigan's current version of Article 3, a "maker" is defined as "a person who

signs or is identified in a note as a person undertaking to pay." Mich. Stat. Ann. § 19.3103(1)(e).

**12.** In further support of its argument, the government maintains that under Mich. Stat. Ann. § 19.3419, the Trust is an "accommodation party" and hence primarily liable. Under § 19.3419(2), however, an accommodation party "is obliged to pay the instrument in the capacity in which the accommodation party signs." *Id.* The Trust signed a guaranty agreement and therefore has the capacity of a guarantor.

the lease and surety agreement were signed on the same day, and the agreement stated that "I do hereby become surety for the punctual payment of the rent and performance ... and if any default shall at any time be made therein [I] do hereby promise and agree to pay unto [the lessor] the said rent and arrears thereof that may be due." *Id.* at 863.

■ Here, however, the Trust appears to be a "guarantor" rather than a "surety." Indeed, the agreement signed by the Trust was titled "Guaranty" and stated that "[t]he undersigned ... unconditionally guarantee(s) to Comerica Bank–Detroit ... payment when due." [13] No language in the guaranty agreement indicates that the Trust was "primarily liable." Also, the fact that the guaranty agreement appears to be a distinct agreement contained in a document separate from the note further indicates that it was an "independent, collateral agreement." [14] Although the guaranty was "unconditional," and the mortgage and guaranty agreement were entered into on the same day, these facts alone do not contradict the language of the guaranty agreement. As such, the circumstances indicate that the Trust was a guarantor and thus secondarily liable.

■ Further, the government has not established that a genuine issue of material fact exists as to whether the Trust and Ardmore should be considered effectively the same legal entity. The government also has not demonstrated that there is a genuine issue of material fact regarding whether the real property was inadequate security for the loan. In other words, there is no evidence that the loan from Comerica was given to Ardmore primarily on the strength of the Trust's guaranty. Therefore, on the record as it stands, there is no dispute that the loan was the primary obligation of Ardmore, and the Trust was secondarily liable. Accordingly, because the Trust satisfied the guaranty obligation, the Trust is subrogated to the rights of Comerica. The Trust's interest in the real property thus has priority over the government's tax liens. *See* 26 U.S.C. § 6323(i)(2).

## IV.

### A.

■ The government asserts that there is a question of fact regarding the amount secured by the mortgage. The government contends that the Trust should have priority over the tax liens "in a maximum amount equal to the lesser of the outstanding debt which was assigned or the amount of the consideration provided by the Trust." The government argues that the IRS's inquiry and the subsequent response in March 1995 establish that the note had an outstanding balance of about $300,000. In contrast, the Trust argues that the note had an outstanding balance of over $2,500,000 in July 1994, offering the Trust's agreement to pay Comerica this amount as evidence. As such, a genuine issue of material fact exists as to the balance secured by the mortgage.

### B.

The government also asserts that there is a question of fact as to whether the payment of $1,270,000 was actually made by the Trust because the money was wired directly to Comerica from the proceeds of the sale of Harley's Golf Course. The government offers no specific facts to support this assertion. The Trust, however, has come forward with evidence showing that the Trust was the primary beneficiary of the Estate of Harley Robinson, and that Harley's Golf Course owed the Estate of Harley Robinson approximately $1,400,000. The Trust says that because it was already twelve days late in making its payment to Comerica, it was more convenient to wire the money from the sale of Harley's Golf Course directly to Comerica.

---

**13.** Although the copy of the guaranty furnished to the Court does not have the title "Guaranty" at the top, it appears to have been cut off by the copier. The other guaranty agreements for the other loans appear to contain identical language to the Trust's guaranty, and they have the word "Guaranty" at the top of the document.

**14.** The note was not furnished to the Court by the government as an exhibit, although the mortgage was.

The government's conclusory assertion therefore fails to rise to a level sufficient to withstand summary judgment.

## V.

The Trust's motion to amend its complaint and add party defendants is GRANTED. For the reasons stated above, the Trust's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The Trust is subrogated to Comerica's rights under the mortgage and note. The only question of material fact remaining is the amount of the outstanding balance of the loan that was secured by the mortgage at the time the Trust satisfied the guaranty obligation. The government's motion is DENIED.

SO ORDERED.